766 F.2d 1261
 MINNESOTA TIMBER PRODUCERS ASSOCIATIONS, INC., Appellee,
v.
AMERICAN MUTUAL INSURANCE COMPANY OF BOSTON, Appellant,
v.
Tom EVENSON, James Hall, Thomas McCabe, Clayton Peterson,
and John Peterson, Appellees/Intervenors.
 No. 84-5113.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 11, 1984.
Decided July 11, 1985.
 
 Louis G. Corsi, New York City, for appellant.
 Daniel H. Mundt, Duluth, Minn., for appellee.
 Before HEANEY, ROSS and FAGG, Circuit Judges.
 FAGG, Circuit Judge.
 
 
 1
 American Mutual Insurance Company of Boston (American Mutual or Company) appeals from an adverse jury verdict rendered in favor of the Minnesota Timber Producers Association, Inc. (MTPA or Association). Three issues are presented by this appeal. First, did American Mutual and the Association enter into a contract establishing the terms and conditions of a group worker compensation insurance program? Second, if such a contract was entered into, did American Mutual breach the terms and conditions of this contract by unilaterally altering the operation of the group program? Third, if American Mutual breached this contract, did the actions constituting the breach also constitute fraud or a breach of fiduciary duty and thus support an award of punitive damages?
 
 
 2
 Following trial, the jury concluded that American Mutual and the Association had entered into a contract and that this contract controlled the terms and conditions of a group worker compensation insurance program. The jury also concluded that American Mutual breached this contract and that this breach constituted either fraud or a breach of fiduciary duty. On the basis of these findings, the jury awarded the Association $237,836 in compensatory damages and $1,000,000 in punitive damages. We affirm in part and reverse in part.
 
 
 3
 The MTPA is a nonprofit Minnesota corporation which actively represents many Minnesota timber producers. In the late 1960s and early 1970s, the Association began to explore the possibility of establishing a group worker compensation insurance program for its members. In June of 1972, the Association's insurance committee met with representatives of American Mutual to discuss the possibility of establishing such a program for the members of the MTPA.
 
 
 4
 These discussions centered around the creation of a worker compensation "safety group." This safety group would be made up of qualifying timber producers who, through a defined program of accident prevention and loss control, would work with American Mutual's engineers and safety experts to reduce the overall cost of worker compensation insurance. The savings realized by these efforts would be returned to the individual members of the group in the form of a "dividend." The dividend received by any individual participant would represent that participant's pro rata share of the money remaining after losses, charges, and other costs were deducted from the total group premium collected in that particular year.
 
 
 5
 Following these discussions, American Mutual presented the insurance committee with what it termed a "Proposal for Insurance Coverage." This proposal embodied the parties' previous discussions and detailed specifically both how the safety group would be established and how the group would operate. The proposal also sought the endorsement of the Association and provided that once the Association agreed to endorse American Mutual's plan, American Mutual would solicit directly the members of the MTPA. Timber producers who joined the safety group would receive individual insurance policies from American Mutual, and when a minimum of fifteen members and $50,000 in annual premiums had been enlisted, the insurance plan as outlined in the "Proposal for Insurance Coverage" would go into effect.
 
 
 6
 The American Mutual proposal also detailed how the yearly dividend would be determined. The proposal provided that the dividend would be established by the American Mutual board of directors through the application of the Company's "dividend guideline rules." The dividend guideline rules were made a part of the American Mutual proposal.
 
 
 7
 These rules provided that all premiums paid to the Company by the safety group for any one year would be pooled. From this total pool of premiums, administration charges, insurance charges, and losses would then be deducted. After these deductions were made, a portion of the remaining balance (the gross dividend) could, in the discretion of American Mutual's board of directors, be placed in a contingent balance fund.
 
 
 8
 The money placed in this fund was to be retained by the Company both to cover unexpected losses and to help stabilize dividend return. The amount that could properly be retained by the Company, however, was specifically limited to the following amounts:
 
 
 9
 (1) 20% of the first $100,000 in yearly premiums could be placed in the fund;
 
 
 10
 (2) 15% of the next $400,000 in yearly premiums could be placed in the fund; and
 
 
 11
 (3) 10% of amounts over $500,000 in yearly premiums could be placed in the fund.
 
 
 12
 After allowing for any permissible amount that might be placed in the contingent balance fund, the dividend guideline rules provided that the amount remaining was to be "available" for distribution as a dividend. No other contingent fund was provided or allowed for by the proposal.
 
 
 13
 After receiving the proposal, the Association and American Mutual discussed various aspects of the proposal and its operation. These discussions focused primarily on the contingent balance fund, to which the Association was initially opposed. The Association, however, eventually agreed to accept the contingency fund as presented in American Mutual's proposal. Apparently, two primary factors persuaded the Association to accept the establishment of this fund. First, the amount of money that could be placed in the fund was subject to specific, well defined limitations. Second, the money placed in the fund would, in the event that the group was terminated, be distributed to the plan's participants.
 
 
 14
 In December of 1972, the MTPA board of directors agreed to endorse the American Mutual proposal. Following this endorsement, American Mutual began to solicit potential plan participants. Within a few months, the minimum number of participants and premiums had been reached and the plan was placed into effect.
 
 
 15
 Between 1973 and 1978, the plan grew steadily and proved quite successful. The Association and American Mutual worked closely together and each took an active role in dealing with and correcting any problems that arose. During that period, over $1,000,000 in dividends were returned to the plan's participants which, beginning in 1974, included both MTPA members and non-MTPA members. On the whole, the insurance group was operated and administered as had been presented in the American Mutual proposal.
 
 
 16
 In November of 1978, the American Mutual board of directors modified the Company's national worker compensation plan. This plan, which was adopted by the Company in 1963, established the Company's guidelines with respect to its many worker compensation safety groups. Although American Mutual's 1972 proposal to the Association was based on this plan, it appears (and the jury could have found) that the Association was not made aware of the existence of this national plan during the formation of the MTPA/American Mutual safety group.
 
 
 17
 While several modifications to this national plan were made by the American Mutual board of directors, the modification most relevant to this action authorized the board to create a second type of contingency fund, a dividend stabilization fund. This fund, when actually established for a particular safety group, would enable the Company to retain (for a limited time) amounts over and above those authorized to be placed in the contingent balance fund by the dividend guideline rules. While the American Mutual proposal had specifically provided for a contingent balance fund, it did not provide for or anticipate the establishment of any additional contingency fund.
 
 
 18
 In February of 1979, the Company's board of directors, in determining the MTPA 1978 dividend, applied these modified national rules to the Association's safety group and placed $219,782 in the dividend stabilization fund. In late 1979 or early 1980, the directors, in determining the MTPA 1979 dividend, placed $165,819 in the dividend stabilization fund. In 1980 and 1981, these amounts were returned to the members of the safety group pursuant to the Company's modified national rules. The Association learned of these actions only after the present lawsuit had begun.
 
 
 19
 In 1981, for a variety of reasons, MTPA revoked its endorsement of the American Mutual plan. Following this revocation, the Association took the position that the removal of its endorsement terminated the safety group as a whole and requested that American Mutual return the money it then held in the contingent balance fund. American Mutual refused, taking the position that the withdrawal of the Association's endorsement had no effect on the operation of the safety group. This litigation followed.
 
 
 20
 In its complaint, the Association asserted a variety of claims centering around breach of contract, breach of fiduciary duty, fraud, and breach of warranty. Initially, the controversy focused on the Association's right to terminate the insurance group and by that means obligate American Mutual to return the money retained by it. At trial, however, the central issue became whether any type of contractual agreement existed between the parties and whether American Mutual breached any such agreement through the creation of the dividend stabilization fund. A further issue became whether the creation of this fund not only breached a contractual agreement but whether the same actions constituting the breach also constituted fraud or a breach of fiduciary duty and would support an award of punitive damages for the breach of contract.
 
 
 21
 Three central issues were submitted to the jury. First, did a contract exist? Second, was that contract breached? Third, did the breach constitute fraud or a breach of a fiduciary duty and as such support an award of punitive damages? A separate fraud count based on asserted misrepresentations of one of American Mutual's employees was not submitted to the jury. Also, the issue of whether the Association could properly terminate the group was not submitted to the jury. As indicated, the jury answered all three issues submitted to it affirmatively and awarded $237,836 in compensatory damages and $1,000,000 in punitive damages. This appeal followed.
 
 
 22
 The first issue to be addressed is whether a contract establishing the terms and conditions of a group insurance program was entered into between American Mutual and the Association. Because this case is brought in diversity, we look to the substantive law of Minnesota in making our decision. In Minnesota, the existence and terms of a contract are for the jury. McEwen v. State Farm Mutual Insurance, 281 N.W.2d 843, 845-46 (Minn.1979); Swanson v. American Hardware Mutual Insurance Co., 359 N.W.2d 705, 708 (Minn.App.1984). We must review the evidence presented at trial in the light most favorable to the prevailing party, and the verdict will not be reversed "if the evidence reasonably or fairly tends to sustain it." Lesmeister v. Dilly, 330 N.W.2d 95, 100 (Minn.1983). See also DeWitt v. Brown, 669 F.2d 516, 523 (8th Cir.1982), and Hanson v. Ford Motor Co., 278 F.2d 586, 589-90 (8th Cir.1960) (Where the state and federal tests for sufficiency of the evidence are similar and neither party has raised an issue with respect to which test should be applied, the state test is controlling.). Here, after carefully reviewing all the evidence, we conclude that the jury could reasonably have found that a contract establishing the terms of a group worker compensation insurance program had been entered into by American Mutual and the Association.
 
 
 23
 The American Mutual proposal followed a series of discussions, the specific focus of which was the establishment of a group worker compensation insurance program. The proposal presented by American Mutual outlined in significant detail how the plan was to operate and in particular how dividends were to be established. After the Association agreed to and endorsed the terms of the American Mutual proposal (exactly as presented), the plan was implemented by both parties and, except for minor modifications that were agreed to by both parties, operated precisely as intended for five years. During this period, both the Association and American Mutual were actively involved in the plan and worked closely together in making the plan a success. Given this evidence, we cannot say that a jury, considering not only the documentary and testimonial evidence but also considering all the surrounding facts and circumstances in the context of the entire transaction, see Capital Warehouse Co. v. McGill-Warner-Farnham Co., 276 Minn. 108, 149 N.W.2d 31, 35 (1967), could not reasonably conclude that in return for the Association's endorsement and active participation American Mutual agreed to abide by the terms and conditions set out in its proposal.
 
 
 24
 Once we conclude that a contract existed between the parties, we must next determine whether this contract was breached by American Mutual. The Association asserts that American Mutual breached the contract when it unilaterally applied the modified national rules to the Association's safety group and established a second contingent fund, the dividend stabilization fund. The jury accepted the Association's position, and we cannot say that its conclusion is without substantial support.
 
 
 25
 The American Mutual proposal allowed for the creation of a single fund, the contingent balance fund. The proposal also specifically limited the amount of money that could be placed in this fund. Under the proposal, all other money remaining was to be "available" for dividends. In light of the parties' extensive negotiations on this point and in light of the Association's express concern over the amount of money to be retained, the jury could reasonably find that under the terms of the parties' agreement all money not placed in the contingent balance fund was to be returned as dividends. Therefore, when American Mutual unilaterally created a second fund and retained money that otherwise would have been returned, it breached its agreement with the Association and became liable for damages caused by this breach.
 
 
 26
 As compensatory damages for this breach, the jury awarded the Association $237,836. Although indirectly, American Mutual attacks the amount and composition of this award. While the jury did not specify the basis for this amount, it appears (and the parties agree) that the award is made up of two basic components: (1) interest on the money wrongly retained by American Mutual in the dividend stabilization fund; and (2) money held by American Mutual in the contingent balance fund at the time the Association filed its amended complaint. We conclude that only the first of these two awards was appropriate.
 
 
 27
 In its instructions, the district court told the jury that between six and twelve percent interest could be awarded on the money improperly retained (although subsequently returned) by American Mutual. Assuming that the jury awarded the Association twelve percent simple interest on the money improperly retained ($219,782 was improperly retained from 1978 to 1980 and $165,819 was improperly retained from 1979 to 1980), only $92,544 should have been awarded. This amount properly compensates the Association for the loss, and the jury's award is affirmed to this extent.
 
 
 28
 With respect to the money awarded by the jury from American Mutual's contingent balance fund ($145,292), we reverse. The money held by the Company in its contingent balance fund could only have been awarded to the Association if the jury found that the withdrawal of the Association's endorsement effectively terminated the safety group. This issue, however, was not submitted to the jury. Hence, the money held by the Company at the time the Association filed its amended complaint cannot provide a basis for recovery.
 
 
 29
 However, even if this issue had been submitted to the jury, we do not believe the jury could reasonably have found that the Association's withdrawal terminated the safety group. While the possibility that the group might at some time be terminated was anticipated, specifics such as how the group would be terminated, who could terminate the group, and under what circumstances the group could be terminated, were not discussed by the parties and were not made a part of either the American Mutual proposal or the parties' agreement. Accordingly, the Association had no contractual right or authority to terminate the group. Rather than result in the group's termination, we conclude that the Association's withdrawal of its endorsement simply ended its contractual relationship with American Mutual and absolved both parties of further performance under the terms of the agreement. As a result, while we affirm the jury's award of compensatory damages to the extent necessary to compensate the Association for the lost use of the money improperly retained by American Mutual ($92,544), we reverse the jury's award to the extent it included money held by the Company at the time that MTPA filed its amended complaint ($145,292).
 
 
 30
 In reaching this result, however, we express no opinion on the issue of termination itself. Both parties agree that the contingent balance fund belongs to the participants of the plan and that upon termination of the insurance group those participating in the group will be entitled to a full accounting and to the return of the funds held by the Company. Our decision in this action has no effect on and in no way lessens this underlying obligation on the part of the Company.
 
 
 31
 We turn next to the jury's award of punitive damages. Under Minnesota law, a plaintiff may recover punitive damages "only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others." MINN.STAT.ANN. Sec. 549.20 More specifically, in a contract action punitive damages are not available "except in exceptional cases where the breach is accompanied by an independent tort." Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46, 52 (Minn.1983); Space Center, Inc. v. 451 Corp., 298 N.W.2d 443, 452 (Minn.1980). In fact, only in cases in which "the breach has resulted from an independent or willful tort and the defendant acted with malice" will punitive damages be recoverable in a contract action. Cherne Industries, Inc. v. Grounds & Associates, 278 N.W.2d 81, 95 (Minn.1979); see also Wild v. Rarig, 234 N.W.2d 775, 789-90 (Minn.1975), cert. denied, 424 U.S. 902, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976). Malicious and willful breach is not enough to give rise to punitive damages in a contract action and goes only to the issue of whether a material breach has occurred. It is only if the willful and malicious conduct itself constitutes an independent tort as well as a breach of contract that punitive damages will be available. Barr/Nelson, 336 N.W.2d at 52-53.
 
 
 32
 In the present action the Association has asserted two grounds in support of the jury's award of punitive damages. First, it asserts that the Company's conduct breached a fiduciary duty owed to the Association. In the alternative, the Association argues that this conduct constituted fraud. We reject both of these assertions.
 
 
 33
 We address first the issue of whether or not a fiduciary relationship existed between American Mutual and the Association. We emphasize that we are dealing only with the relationship existing between American Mutual and the Association. We are not concerned with whether any type of fiduciary relationship might exist between American Mutual and the members of the safety group who actually purchased the worker compensation insurance. This issue was never litigated, and it is clear from the record that the question of a fiduciary relationship submitted to the jury involved only the relationship between American Mutual and the Association.
 
 
 34
 Under Minnesota law, "[a] fiduciary relationship exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.' " Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn.1985) (quoting Stark v. Equitable Life Assurance Society, 205 Minn. 138, 285 N.W. 466, 470 (1939) ). Other factors, such as disparity in business experience and greater access to facts and legal resources, may also, when combined with a confidential relationship, give rise to a fiduciary relationship. Id. Reviewing the evidence presented in light of these factors, although the existence of a fiduciary relationship is a question of fact and normally for the jury, see Murphy v. Country House, Inc., 240 N.W.2d 507, 512 (Minn.1976), we conclude as a matter of law that no such relationship existed between the Association and American Mutual.
 
 
 35
 In its essence, this is a contract action. The parties dealt with each other on an arm's length basis and there is no evidence that any type of fiduciary relationship was intended or that in fact any type of confidential relationship existed between American Mutual and the Association. Further, the Association made no showing that American Mutual enjoyed superior or excessive influence over the Association. Rather, the only evidence pointed to by the Association is a statement by an officer of the Association that they "trusted" American Mutual. We conclude as a matter of law that no fiduciary relationship existed between the parties.
 
 
 36
 We next address the issue of fraud. In so doing, we are not concerned with whether separate and apart from the acts constituting the breach certain actions of American Mutual were themselves fraudulent. Rather, because the only cause of action submitted to the jury was based on breach of contract, we are concerned only with whether the same actions constituting the breach also constitute the independent tort of fraud. Barr/Nelson, 336 N.W.2d at 52; Cherne, 278 N.W.2d at 95; Rarig, 234 N.W.2d at 789-90. Given this focus, we conclude that the breach of contract did not constitute fraud.
 
 
 37
 The actions taken by the Company were taken in the belief that they had the right to apply the modified national rules to the Association's safety group. By so doing, the Company breached its contract with the Association. The acts constituting the breach, however, did not violate any independent duty (fiduciary or otherwise) owed by American Mutual to the Association and did not constitute fraud or any other independent tort. Consequently, while separate and apart from the breach, certain actions of the Company might have given rise to separate tort liability and potentially to punitive damages, the actions constituting the breach do not. Thus, the jury's award of punitive damages for breach of contract was improper and must be reversed.
 
 
 38
 We affirm the jury's conclusion that a contract existed and that this contract was breached. We also affirm the jury's award of compensatory damages to the extent necessary to compensate the Association for the lost use of the money improperly retained ($92,544). However, we reverse the remainder of the jury's compensatory damages award and the jury's award of punitive damages.
 
 
 39
 Affirmed in part and reversed in part.
 
 
 40
 ROSS, Circuit Judge, dissenting.
 
 
 41
 I dissent because I do not believe that, as a matter of law, there was ever a contract between Minnesota Timber Producers Association and American Mutual Insurance Company.
 
 
 42
 In the magistrate's opinion he carefully sets forth the reasons for his finding that there was no contract which the Association had standing to enforce. I agree with these reasons and note that the facts clearly show as follows:
 
 
 43
 1. There was no formal written contract between the Association and American Mutual.
 
 
 44
 2. The Association was not a party to the written insurance policy contracts between the members and nonmembers of the Association and American Mutual. It did not claim to be a party to a contract with American Mutual for several years after the policies were issued.
 
 
 45
 3. Dividends in excess of $3.4 million were paid direct to the individual policyholders rather than to the Association.
 
 
 46
 4. Cancellation rights were provided in the individual policies of each member and nonmember of the Association.
 
 
 47
 5. The plan eventually included both members and nonmembers of the Association. It is not clear to me how the Association intends to distribute the money or under what theory they are being permitted to collect on behalf of the nonmembers of the Association.
 
 
 48
 In my opinion, the documents and the testimony received in this case do not show the existence of any contract between the Association and American Mutual. I agree with the balance of the reasoning of the majority opinion.