H ENTERPRISES INTERNATIONAL, INC., Waldorf Corporation, Richard E. O'Leary, John E. Byrne, Anita M. Bertelson, Plaintiffs,

v.

GENERAL ELECTRIC CAPITAL CORPORATION, Defendant and Counterclaim Plaintiff,

v.

H ENTERPRISES INTERNATIONAL, INC., Waldorf Corporation, Richard E. O'Leary, John E. Byrne, Anita M. Bertelson, Counterdefendants,

and

Eugene U. Frey, George J. Frey and Edward K. Bixby as Trustees of the Mary F. Frey Family Trust U/A dated July 2, 1985; James R. Frey, Eugene U. Frey and Mary F. Frey as Trustees of the James R. Frey 1987 Trust U/A dated December 30, 1987; John J. Frey, Eugene U. Frey and Mary F. Frey as Trustees of the John J. Frey 1987 Trust dated December 30, 1987; and Carole F. Wolfe, Eugene U. Frey and Mary F. Frey as Trustees of the Carole F. Wolfe Trust U/A dated December 30, 1987, Additional Defendants on the Counterclaim.

Civ. No. 4-91-679.

United States District Court, D. Minnesota, Fourth Division.

Oct. 6, 1993.

James Robert Safley, Sara Anspach Poulos, Elliot S. Kaplan, Rita Coyle DeMeules, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for plaintiffs.

Peter McCreery Lancaster, Dorsey & Whitney, Madge S. Thorsen, Jeffrey J. Weill, Robert Bruce MacDonald, Meredith Marie McQuaid, Daniel D. Hill, Zoltan Pinter, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, John S. McGeeney, Paul, Hastings, Janofsky & Walker, Stamford, CT, for General Elec. Capital Corp.

Harold D. Field, Jr., Leonard, Street & Deinard, James Robert Safley, Elliot S. Kaplan, Rita Coyle DeMeules, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for H Enterprises Intern., Inc., Richard E. O'Leary, John E. Byrne, Anita M. Bertelsen.

James Robert Safley, Elliot S. Kaplan, Rita Coyle DeMeules, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for Waldorf Corp.

Harold D. Field, Jr., Jane F. Godfrey, Leonard Street & Deinard, Minneapolis, MN, for Eugene U. Frey, George J. Frey, Edward K. Bixby, James R. Frey, Mary F. Frey, John J. Frey and Carole F. Wolfe.

### ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendant General Electric Capital Corporation ("GECC") for summary judgment on plaintiffs' claims for tortious interference with contractual relations, tortious interference with prospective business relations, fraud, breach of fiduciary duty and the duty of good faith and fair dealing and Waldorf's damages claims. GECC also seeks summary judgment on claims asserted by the counterdefendants for tortious interference with contractual relations, breach of the duty of good faith and fair dealing and fraud. Based on a review of the file, record and proceedings herein, the motions are granted in part and denied in part.

## BACKGROUND [1]

### 1. Overview

Waldorf Corporation ("Waldorf") is engaged in the business of recycled paperboard and folding carton manufacturing, and is a wholly owned subsidiary of H Enterprises International, Inc. ("HEII"). On November 24, 1987, Waldorf entered into a loan and security agreement with GECC which replaced an earlier loan agreement between the parties ("1987 loan agreement").[2] Waldorf granted GECC a first priority security interest in all of Waldorf's assets to secure its obligations under the 1987 loan agreement. By its terms, the agreement expires on December 31, 1997. During the refinancing, the parties also executed a separate contingent interest agreement that provides for a future contingent interest payment to GECC upon a triggering disposition of the company.[3]

By its terms, the contingent interest agreement is secured by guarantees of HEII and its shareholders.[4] Whether the contingent interest agreement is also secured by GECC's security interest in Waldorf's assets is hotly disputed. Plaintiffs contend that GECC's security interest was not intended to secure any obligations or performance under the contingent interest agreement. Plaintiffs claim that the contingent interest agreement was entered merely to provide GECC with an additional interest payment in the event of a triggering disposition. GECC claims, however, that the contingent interest agreement was designed to maintain a balance between Waldorf, the shareholders and affiliates until a triggering disposition occurs. GECC contends that the security interest secures not only the 1987 loan agreement and the obligations contained therein, but also all obligations arising from other agreements related to the refinancing, including Waldorf's performance under the contingent interest agreement.

On February 27, 1992, Waldorf paid GECC $91,218,822.57, which plaintiffs contend represents all amounts due under the 1987 loan agreement, including liquidated damages. Despite that payment, GECC insists that it retains a first priority security interest in Waldorf's assets. GECC contends its security interest survives Waldorf's prepayment and continues to protect GECC's rights under the contingent interest agreement until such interest is paid or the agreement expires by its terms.[5] Waldorf contends that it has fully discharged its obligations under the 1987 loan agreement by paying GECC in full. Waldorf insists that the contingent interest agreement was never secured by its assets or the loan agreement.[6]

### 2. Plaintiffs' Version of the Facts

Plaintiffs claim that GECC misrepresented its position during the 1987 contractual negotiations. In 1987, Waldorf paid off a 1985

---

1. The background of this case is set forth in detail in the orders entered by the court on October 8, 1991, denying plaintiffs' request for injunctive relief, and April 30, 1992, denying defendant's motion for partial summary judgment.

2. GECC extended Waldorf a $175 million line of credit consisting of a $125 million term loan and a $50 million revolver loan.

3. A *triggering disposition in essence involves a transfer of more than 50 percent of the controlling interest in Waldorf or its parent at any time before December 31, 1997.*

4. Two shareholder groups, the Trident group and the Frey group, each own 50% of HEII's stock. The Trident group is composed of plaintiffs Richard O'Leary, John Byrne and Anita Bertelson. The Frey group consists of Eugene U. Frey, various family members and trustees of family trusts, all of whom are additional defendants on the counterclaim.

5. In large part, GECC relies on Section 7.5 of the 1987 loan agreement which provides in part that:

 Except as otherwise expressly provided for in this Agreement, and in the Other Agreements, no termination or cancellation (regardless of cause or procedure) of this Agreement or the Other Agreements shall in any way affect or impair the powers, obligations, rights, and liabilities of Borrower or Lender relating to ... any of the undertakings, agreements, covenants, warranties, and representations of Borrower or Lender contained in this Agreement or Other Agreements. All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

6. The assets of Waldorf are currently valued at approximately $500 million.

loan with GECC and sought financing for a recapitalization. GECC was eager to provide financing as the earlier loan to Waldorf turned out to be a "shrewd investment." In August 1987, GECC made a written proposal to provide new financing to Waldorf. Waldorf and Joseph Fleming ("Fleming") of GECC reached a tentative agreement that GECC would accept $20 million to retire the 1985 warrant. Michael Carpenter ("Carpenter"), a senior GECC executive, believed the warrant was more valuable and demanded a higher amount which Waldorf refused. GECC and Waldorf reached a compromise which called for Waldorf to pay GECC $20 million to retire the warrant. Waldorf also agreed to enter into a contingent interest agreement that provided for GECC to receive additional value from Waldorf upon a triggering disposition. GECC proposed that an additional payment be triggered by a sale of 50% of the controlling interest of Waldorf or HEII. Waldorf insisted, however, that a contingent interest payment would not be due unless more than 50% of Waldorf or HEII was sold so that a shareholder buyout would not require an additional payment to GECC.

During the 1987 negotiations, plaintiffs expressed concern about Waldorf's right to refinance the 1987 loan with GECC prior to its expiration date. Fleming indicated that Waldorf had the right to terminate the loan before its expiration. Waldorf also discussed its right to refinance with Carpenter. Carpenter believed that Waldorf would refinance before the loan expired. According to plaintiffs, Carpenter was concerned that if Waldorf repaid the 1987 loan before it expired, the contingent interest agreement would be unsecured and unprotected because GECC would no longer hold a security interest in Waldorf's assets. To provide some protection, Carpenter asked HEII and its shareholders to personally guarantee Waldorf's performance of the contingent interest agreement. HEII and its shareholders conceded that GECC needed some security to look to in the event of refinancing and a subsequent triggering disposition. Based on the representation that the contingent interest agreement was not secured by Waldorf's assets, HEII and its shareholders agreed to the guarantees.[7]

In 1990, Waldorf sought to acquire a large Canadian paperboard manufacturer, Paperboard Industries Corporation ("PIC"). The Trident group favored the transaction, while the Frey group opposed it. Waldorf informed GECC of the shareholder deadlock and advised GECC that Waldorf could no longer pursue PIC. The dispute over PIC prompted the two groups to discuss a shareholder buyout. In late October 1990, the Trident group offered to buy the interests of the Frey group. The Trident group informed GECC of the offer; Fleming stated that a shareholder buyout would be good for Waldorf and that GECC would be interested in financing a buyout.

According to plaintiffs, GECC encouraged a shareholder buyout because it erroneously believed it would receive a contingent interest payment. Fleming soon discovered, however, that the proposed buyout of the Frey group's interest would not trigger a contingent interest payment. Plaintiffs contend that GECC then began devising a scheme to compel a contingent interest payment. An internal GECC memorandum addressed to Fleming stated that a shareholder buyout would not result in a contingent interest payment. Nevertheless, the memorandum suggested that some provisions of the contingent interest agreement could be used as a "lever to force contingent interest payment to GECC."

Fleming continued to participate in discussions and meetings aimed at accomplishing a shareholder buyout. After Fleming confirmed that GECC would finance a buyout, the Frey group signed a letter of intent on April 10, 1991, to buy the interests of the Trident group. Fleming stated that GECC could provide a commitment to finance by May 21, 1991, the financing deadline set by the Frey group. On April 25, 1991, GECC and Frey signed a letter setting forth the

---

7. HEII and its shareholders refused GECC's requests that they personally guarantee the 1987 Loan and Security Agreement and an earlier loan agreement because GECC's exposure as a lender was fully covered by a security interest in Waldorf's assets.

terms on which GECC would provide financing of up to $240 million for the recapitalization of Waldorf and the redemption of the Trident stock. Fleming indicated that the financing would be accepted by GECC subject only to due diligence.

Fleming also proposed that the contingent interest agreement be liquidated in conjunction with the buyout. Frey agreed and offered to pay GECC $10 million to retire the agreement. GECC concluded, however, that $10 million was not adequate to retire the contingent interest agreement. GECC noted that it was unlikely that "the conservative Frey" would sell Waldorf in the "foreseeable future" so as to trigger a contingent interest payment. GECC then altered the terms of the financing proposal which were rejected by Frey. By that time, it was too late for Frey to seek financing from other sources and meet the financing deadline.

The relation between the Trident group and Frey group remained strained. At the behest of Waldorf's outside directors, the Frey group agreed to sell its stock to the Trident group for an amount not to exceed $5 million. A draft redemption agreement was sent to GECC in late July 1991 and a final redemption agreement was signed by HEII and the Trident group in early August 1991. Plaintiffs contend that, upon learning of the proposed buyout, GECC tried to block the redemption or to compel a contingent interest payment. A GECC memorandum dated July 31, 1991, said that GECC's "position on an attempt to block the transaction under the rights of the [contingent interest agreement]" had not been related to either the Frey or Trident group.

On August 5, 1991, the Trident group met with GECC to discuss financing the redemption agreement. The Trident group had already informed GECC that it did not want to liquidate the contingent interest agreement as part of the redemption. GECC indicated it would not finance the redemption agreement unless it received a substantial contingent interest payment. In response to GECC's position, Richard O'Leary ("O'Leary") of the Trident group stated Waldorf would pay the 1987 loan agreement in full and the shareholders would get funding for the redemption agreement elsewhere. Fleming then told plaintiffs for the first time that they could not pledge Waldorf assets while the contingent interest agreement was outstanding.

On August 9, 1991, the Trident group told GECC that it planned to obtain alternative financing by August 16, 1991. The redemption agreement required the Trident group to secure financing before the closing date of September 30, 1991. GECC stated that the proposed redemption agreement was prohibited under the contingent interest agreement. Two weeks later, GECC told plaintiffs that it would not consent to the redemption agreement or release its security interest in Waldorf's assets "unless all obligations under the contingent interest agreement are satisfied concurrently with the obligations" under the 1987 loan agreement. Plaintiffs contend that GECC took these steps to intentionally prevent plaintiffs from obtaining financing for the redemption agreement.

Waldorf contends that by wrongfully asserting its security interest, GECC has, at the very least, impaired Waldorf's ability to secure adequate financing and prevented Waldorf from acquiring two separate companies, Visy Recycle, Inc. ("Visy") in 1991 and PIC in 1992. After GECC refused to finance the redemption agreement, Waldorf contacted several lenders. Because secondary secured status is not favored, most lenders declined to provide financing while GECC's security interest was outstanding. Several lenders indicated that they would provide attractive financing terms if GECC's first security interest was removed.[8]

In the fall of 1991, Waldorf had a brief opportunity to acquire Visy, a corrugated medium plant in Indiana, at a low price. Waldorf lacked sufficient financing to commit funds to acquire Visy. According to Waldorf, GECC rejected its request to discuss additional financing. Waldorf attempted to arrange other financing but was not successful. Waldorf claims that it had virtually no credit

---

8. One lender offered to loan Waldorf $125 million unsecured; another lender offered to loan Waldorf $250 million in exchange for a first security interest in Waldorf's assets.

capacity because GECC retained a first security interest in Waldorf's assets and intended to do so even if the 1987 loan was repaid. Waldorf, with HEII's support, made a low offer for Visy in order to delay the negotiations while financing was sought. The offer was rejected and subsequently the asking price for Visy rose substantially.

In November 1991, Chase Manhattan Bank ("Chase Manhattan") agreed to underwrite a $150 million loan to Waldorf secured by a second position in Waldorf's assets ("Chase loan"). Chase attempted to syndicate the loan but was unable to obtain syndication partners due to GECC's security interest. Because Chase was forced to take on more risk than originally intended, it prohibited Waldorf from borrowing additional money except for $25 million for purchase money liens on equipment. In addition, the Chase loan amortizes rapidly. Waldorf regarded the Chase loan as an interim financing arrangement necessary to pay off the GECC loan and meet basic financial needs by providing a limited amount of operating capital.

In late February 1992, Waldorf paid GECC just over $91 million to satisfy all principal, interest and liquidated damages due and owing under the 1987 loan agreement. Despite that payment, GECC refused to release its first priority security interest in Waldorf's assets. GECC insists that the terms and conditions of the 1987 loan agreement survive the prepayment of the 1987 loan. GECC also claims that the security interest protects its rights under the contingent interest agreement by restricting Waldorf's ability to encumber or transfer assets and make capital expenditures.

The Trident and Frey groups resolved the acquisition policies of Waldorf in early 1992. Waldorf once again sought to acquire PIC in May 1992. Waldorf made a written offer conditioned on limited due diligence which PIC rejected. Waldorf contends that the limits placed on its credit capacity by GECC's security interest prevented it from acquiring PIC. Waldorf also claims that because of GECC's asserted security interest, it has been forced to forego capital improvements to its St. Paul mill which are needed for Waldorf to remain competitive.

In the complaint, along with claims of breach of contract, plaintiffs assert GECC tortiously interfered with contractual and prospective business relations, committed fraud, and breached a fiduciary duty and the duty of good faith and fair dealing. GECC moves for summary judgment on the noncontractual claims. GECC contends that, in addition to failing to prove these claims, plaintiffs improperly try to convert contractual claims into tort claims.

## DISCUSSION

■ The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires the trial court to direct a verdict if there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, a verdict should not be directed. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. If a plaintiff fails to support

an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

### 1. Tortious Interference with Prospective Business Relations

 Plaintiffs contend that Minnesota law applies to the claims of tortious interference with prospective business relations. GECC asserts, however, that Illinois law applies and that the claims for tortious interference with prospective business relations fail under Illinois law. Thus, the court must analyze the choice of law issue before reaching the merits of the claims based on the tort of interference with prospective business relations. Three questions must be answered when analyzing choice of law:

(1) Is there a conflict between the state laws that may be outcome determinative? *Cargill, Inc. v. Products Eng'g Co.,* 627 F.Supp. 1492, 1495 (D.Minn.1986) (citing *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973)).

(2) Do the forum and alternative states both have sufficient contacts so that the application of either state's law satisfies constitutional due process? *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 313–14, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981) (plurality).

(3) Applying the choice of law analysis of the forum state, which state's law should apply? *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

### A. Outcome Determinative Conflict

 The parties dispute whether an outcome determinative conflict of law exists between Minnesota and Illinois law. To state a cause of action for tortious interference with prospective business relations under Minnesota law, plaintiffs must show that defendant intentionally and improperly interfered with

their prospective business relations. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn.1982). The interference may consist of (1) inducing a third person not to enter into or to continue the prospective relation, or (2) preventing the other from continuing the prospective relationship. *Hough Transit, Ltd. v. Nat'l Farmers Org.,* 472 N.W.2d 358, 361 (Minn.Ct.App.1991); *United Wild Rice,* 313 N.W.2d at 632–33 (quoting Rest. (Second) of Torts, § 766B (1979)).

 The elements of the tort of interference with prospective business relations under Illinois law are: (1) the existence of a valid business relationship or plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of this relationship or expectancy; (3) intentional interference by defendant inducing termination of the relationship or preventing the expectancy from ripening into a valid business relationship; (4) and damage to plaintiff as a result of the interference. *Dangeles v. Muhlenfeld,* 191 Ill.App.3d 791, 138 Ill.Dec. 815, 820, 548 N.E.2d 45, 50 (1989). In addition, Illinois law requires some action by the defendant directed toward a third party which results in such interference. *Laser Industries, Ltd. v. Eder Instrument Co.,* 573 F.Supp. 987, 994 (N.D.Ill.1983); *Galinski v. Kessler,* 134 Ill. App.3d 602, 89 Ill.Dec. 433, 437, 480 N.E.2d 1176, 1180 (1985). *See also State Nat'l Bank v. Academia, Inc.,* 802 S.W.2d 282 (Tex.Ct. App.1990) (Illinois law "requires some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff.").[9]

The Minnesota courts have apparently never addressed whether defendant's conduct itself must be directed at a third party. GECC contends that because Minnesota policy favors keeping tort law and contract law distinct, Minnesota courts would require action toward a third party if the question were put to them. Plaintiffs point out that the

---

9. The federal courts applying Illinois law and the appellate courts of Illinois have stated that the tort of interference with prospective business relations requires action by the defendant towards a third party which results in such interference. The Supreme Court of Illinois has not directly addressed the issue.

Minnesota Supreme Court has adopted verbatim the elements of the tort of interference with prospective business relations set forth in Section 766B of the Restatement (Second) of Torts. *United Wild Rice*, 313 N.W.2d at 632–33. That section provides that:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relations, whether the interference consists of:
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Rest. (Second) of Torts § 766B (1979).

■ The court finds that subsection (b) of the Restatement, which makes actionable conduct by a defendant which interferes with plaintiff's ability to contract regardless of whether the conduct is directed at a third party, is the law in Minnesota. The court agrees that contract claims should not be converted into tort claims. Allowing the claims of intentional interference with prospective business relations that have been pled in this case to stand, however, does not impermissibly expand a contract claim into a tort claim. In the absence of any Minnesota state cases expressly or implicitly holding to the contrary, the court holds that a Minnesota court would not deviate from the Restatement by limiting the tort to interference which results from conduct directed toward a third party.

Having concluded that Minnesota and Illinois formulate the tort of interference with prospective business relations differently, the court next examines whether the conflict is outcome determinative. After examining the relevant case law, the court concludes that Illinois law would foreclose the claims against GECC for tortious interference with prospec-

tive business relations, while Minnesota law recognizes such claims based on the facts present in this case.[10] Accordingly, the court holds that an outcome determinative conflict exists.

## B. Sufficiency of Contacts of Forum and Alternative States

The constitutionality of the application of either Minnesota or Illinois law is not disputed. The Minnesota contacts include: HEII and Waldorf are Delaware corporations licensed to do business in Minnesota with offices and operating facilities in Minnesota, plaintiff John E. Byrne is a Minnesota resident, the assets encumbered by GECC's security interest are, for the most part, located in Minnesota, the potential relationships interfered with originated in Minnesota and the alleged injuries occurred in Minnesota. The Illinois contacts include: Waldorf has a plant in Illinois, GECC is a New York corporation with offices in Illinois, the contract giving rise to the relationship was signed in Illinois and is governed by Illinois law and the lenders at issue are from Illinois and New York. The court finds that both Minnesota and Illinois have sufficient contacts to justify application of either state's law without offending due process.

## C. Choice of Law Analysis Under Minnesota Law

■ Minnesota has adopted the choice-influencing considerations test as its choice of law method. *See Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408, 412 (1973). Under that method, the court examines the following five factors:

(a) Predictability of results;

(b) Maintenance of interstate and international order;

(c) Simplification of the judicial task;

(d) Advancement of the forum's governmental interest; and

(e) Application of the better rule of law.

---

**10.** Plaintiffs contend that their claims should stand even under Illinois law because the financing statement filed against Waldorf's assets gives notice of GECC's position to third parties. The court does not believe the Illinois courts would embrace this argument. *See State Nat'l Bank v.*

*Academia, Inc.*, 802 S.W.2d 282, 296–97 (Tex.Ct. App.1990) (applying Illinois law; rejecting that plaintiff states a claim where defendant's conduct effects a third party but conduct itself is not directed at a third party).

*Id.* The Minnesota Supreme Court has stressed, however, that only the last two of these considerations, the advancement of the forum's governmental interests and the application of the better rule of law, are relevant in tort cases. *Id.; see also Cargill,* 627 F.Supp. at 1496. The court will focus on these two *Milkovich* factors to determine whether it should apply Minnesota or Illinois law.

### (1) Advancement of the Forum's Governmental Interests

 In evaluating the forum's governmental interests, the court should not apply "rules, which, however acceptable they may be in other states, are inconsistent with [Minnesota's] concept of fairness and equity." *Hime v. State Farm Fire & Casualty Co.,* 284 N.W.2d 829, 833 (Minn.1979). The forum's governmental interest will not manifest itself, however, unless the Illinois rule runs contrary to a strong policy of Minnesota. *Milkovich,* 203 N.W.2d at 414.

The wrongful interference with the formation of a contract is no less actionable under Minnesota law than a wrongful interference with an existing contract. *Carnes v. St. Paul Union Stockyards Co.,* 164 Minn. 457, 205 N.W. 630, 631 (1925). Minnesota law has long recognized that there lies an action for the wrongful interference with prospective business relations. *Joyce v. Great N. Ry. Co.,* 100 Minn. 225, 110 N.W. 975 (1907); *Tuttle v. Buck,* 107 Minn. 145, 119 N.W. 946 (1909). The Minnesota Supreme Court has made clear that Minnesota has an interest in redressing injuries caused by wrongful acts of interference intentionally done. *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.,* 291 Minn. 461, 193 N.W.2d 148, 151 (1971). Thus, Minnesota courts have limited the tort to wrongful and intentional interference with prospective business relations of the plaintiff.[11]

Minnesota courts have not and would not, however, deny recovery simply because the defendant's conduct, although wrongful and intentionally done, is directed at the plaintiff

rather than a third party. Minnesota policy favors redressing the injuries that plaintiffs and the Frey group assert resulted from GECC's alleged wrongful interference in this case. Accordingly, application of Minnesota law protects the forum's interest while application of Illinois law undermines that interest and contravenes the policy of the forum. The court concludes that advancement of the forum's governmental interests favors Minnesota law.

### (2) Application of the Better Rule of Law

 If Illinois law is applied, plaintiffs and the Frey group will have no remedy for their claims of tortious interference with prospective business relations. That fact makes it probable that a Minnesota court would choose Minnesota law as the better law. Illinois law forecloses recovery in tort where defendant's conduct, although wrongful and intentionally done, is directed at the plaintiff rather than a third party. After examining the relevant case law, the court concludes that Minnesota courts would focus on whether the wrongful conduct was intentional and actually interfered with prospective business relations of the plaintiff. Minnesota courts would not, however, limit recovery in the fashion adopted by the Illinois courts. Thus, with all due respect, the court concludes that a Minnesota court would regard Minnesota law as the better law as it pertains to the tort of interference with prospective business relations.

### (3) Other *Milkovich* Factors

While consideration of the two factors discussed above carry the most weight in choice of law analysis, the court notes that the other three *Milkovich* factors also favor application of Minnesota law.

Plaintiffs argue that predictability of results has little relevance because the claims at issue are tort claims and do not deal with contractual and other consensual arrangements. *See, e.g., Milkovich,* 203 N.W.2d at 412. GECC contends, however, that the fac-

---

11. This distinction recognizes both that tort law and contract law serve distinct purposes and that

neither preempts the other.

tor is relevant and favors application of Illinois law because plaintiffs' claims flow from a contractual relationship grounded in Illinois and governed by its laws. Assuming that this factor is relevant in the present context, the court rejects the contention that Illinois law offers a more predictable result. The court finds that GECC knew or should have known that Minnesota law might govern Waldorf's tort claims and that, based on the present facts, application of Minnesota law was foreseeable. Accordingly, the court holds that predictability of results favors application of Minnesota law.

"Maintenance of interstate order requires only that the state whose laws are ultimately applied has a substantial connection with the facts and the particular issue." While both Minnesota and Illinois have sufficient contacts to justify application of either state's law, Minnesota's contacts with the claims of tortious interference are more substantial. In addition, GECC has not articulated any particular way in which interstate order would be threatened by application of Minnesota law. The court finds that application of Minnesota law is consistent with Minnesota state policy and does not unduly threaten interstate order or undermine Illinois state policy.

 Under Minnesota law, simplification of the judicial task generally "poses no problem since the courts are fully capable of administering the law of another forum if called to do so." *Milkovich,* 203 N.W.2d at 412. However, "this factor is obviously advanced when a Minnesota court applies Minnesota law." *Gimmestad v. Gimmestad,* 451 N.W.2d 662, 666 (Minn.Ct.App.1990). The court concludes that on the present facts a Minnesota court would likely apply its own law for purposes of simplifying the judicial task.

Based on the foregoing, the court concludes that under the *Milkovich* analysis, a Minnesota court would apply Minnesota law

in this case to the claims of tortious interference with prospective business relations.[12]

**D. Tortious Interference with Prospective Business Relations**

In Count 5, plaintiffs allege that GECC knew they had prospective business relations with Chase Manhattan and various other lenders and were actively seeking alternative financing. Plaintiffs claim that the lenders have refused to provide financing to Waldorf because of GECC's outstanding security interest. The complaint alleges that by wrongfully asserting its security interest, GECC tortiously interfered with "plaintiffs' prospective business and economic advantage with lenders and others." GECC contends that Count 5 is deficient as a matter of law because it fails to name an individual or identifiable class or describe who refused to deal with Waldorf.

 The mere loss of unspecified business does not establish the tort of intentional interference with prospective business relations under Minnesota law. Rather, wrongful interference with prospective business relations requires intentional conduct affecting specific relationships. *Witte Transp. Co.,* 193 N.W.2d at 151. The court finds that the complaint adequately identifies Chase Manhattan and other lenders as third parties with whom plaintiffs had an expectancy of doing business. The same cannot be said, however, of plaintiffs' expectancy of acquiring PIC or Visy. There are no facts in the complaint to show the existence of prospective business relationships with PIC or Visy, much less to show GECC interfered with those relationships. Accordingly, to the extent Count 5 seeks to assert a tort action based on interference with plaintiffs' prospective relations with PIC or Visy or other non-lenders, the court holds that the claim is subject to dismissal.[13]

 GECC also contends that plaintiffs fail to state a cause of action because

12. Because there is no conflict between the laws of Minnesota and Illinois concerning tortious interference with contractual relations, breach of fiduciary duty and fraud, the court need not address choice of law as it pertains to those claims.

13. Whether plaintiffs may demonstrate damages resulting from GECC's alleged tortious conduct based on the lost acquisitions of PIC and Visy is addressed below.

GECC's assertion in good faith of what it reasonably believes to be its rights under the 1987 loan agreement does not constitute evidence of an intent to interfere with plaintiffs' prospective business relations. *See Union Nat'l Bank of Little Rock v. Federal Nat'l Mortg. Ass'n,* 860 F.2d 847, 858 (8th Cir. 1988). There is evidence, however, that GECC acted neither in good faith nor based on a reasonable belief of its rights under the 1987 loan agreement. Accordingly, the court concludes that summary judgment on the tort of interference with plaintiffs' prospective relations is otherwise precluded because questions of material fact persist.

### (1) Damages and Causation

■■■■ Causation and proximate cause, under Minnesota law, are questions of fact for the jury. *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.,* 938 F.2d 870, 878 (8th Cir.1991). Where the evidence includes several damage causing factors, the jury should generally be allowed to determine the cause of plaintiffs' damages. *Cashman v. Allied Prod. Corp.,* 761 F.2d 1250, 1254–55 (8th Cir.1985). Causation presents a material question of fact if there is evidence that "a defendant's tortious conduct was a substantial factor in bringing about the injury." *Gits v. Norwest Bank Minneapolis,* 390 N.W.2d 835, 837 (Minn.Ct.App.1986).

■■■■ GECC contends that summary judgment is warranted because its assertion of its security interest is neither the legal or factual cause of plaintiffs' alleged losses.[14] As a result of GECC's alleged tortious interference, plaintiffs claim that Waldorf was unable to obtain additional financing and had to forego three projects—the PIC acquisition, the Visy acquisition and a capital expansion of Waldorf's mill in St. Paul, Minnesota. GECC contends that Waldorf made no attempt to obtain financing for these projects. GECC insists that even had Waldorf obtained funding for the PIC and Visy acquisitions, there is no evidence that Waldorf's

offers would have been accepted. GECC also asserts that Waldorf has the financial capacity to fund the capital expansion but has chosen not to do so. GECC concludes that because plaintiffs cannot establish "but for" causation, it is entitled to summary judgment as a matter of law.

Plaintiffs contend that the financing Waldorf secured with Chase Manhattan is the maximum it could obtain in light of GECC's security interest. Before acquiring a loan from Chase Manhattan, Waldorf approached several lenders who refused to provide financing because GECC's security interest was outstanding. The Chase loan, according to plaintiffs, is inadequate to enable Waldorf to acquire PIC or Visy or undertake a capital expansion. Moreover, the Chase loan prohibits Waldorf from borrowing additional funds except for $25 million for purchase money liens on equipment. Chase Manhattan has indicated that the ban on additional borrowing was specifically related to GECC's asserted security interest.

The evidence indicates that there are finite limits on Waldorf's ability to obtain additional financing and that Waldorf could have obtained financing on more attractive terms but for GECC's security interest. When the facts are taken in plaintiffs' favor, there is ample evidence that GECC's security interest has imposed severe limits on Waldorf's ability to obtain credit. When the acquisitions and capital expansion are considered, however, the evidence of causation is less apparent.

Waldorf claims that it did not specifically seek additional financing for PIC or Visy or the capital expansion because further efforts to obtain financing were futile as long as GECC's security interest remained outstanding. There is evidence, however, from which a finder of fact could conclude that further attempts by Waldorf to obtain financing would have been futile in light of the limits imposed by the Chase loan, which have been

---

**14.** This portion of GECC's motion is directed at the damages claimed by plaintiffs and is not limited to Count Five of the complaint. For example, GECC notes that the lost acquisitions could be characterized as consequential damages flowing from breach of contract. Accordingly, while the court addresses GECC's arguments in context of the tort of interference with prospective relations, its holdings apply to these damages even if they are ultimately linked to other counts of plaintiffs' complaint.

directly linked to GECC's security interest, and Waldorf's past inability to obtain financing while GECC's security interest was outstanding. A finder of fact could also determine that Waldorf's inability to acquire PIC or Visy or undertake the capital expansion project was attributable, at least in part, to GECC's conduct. Of course, there is ample evidence to support opposite conclusions. At this point, however, the court must draw all reasonable inferences in favor of plaintiffs.

The court concludes that it would not be appropriate to take the question of causation away from the jury in this case. *See Bieter Co. v. Blomquist,* 987 F.2d 1319, 1329 (8th Cir.1993). The record before the court does not permit the holding as a matter of law that Waldorf would have been unable to undertake the three projects regardless of GECC's actions. The precise degree of injury to Waldorf may be difficult to ascertain and the task of parceling out what injuries were caused by GECC's actions and what injuries may be attributable to other causes will not be easy. The fact that the extent of Waldorf's injury is somewhat speculative, however, does not preclude a finding of causation in this case as a matter of law.

### 2. Tortious Interference with Contract

■■■ To state a cause of action for tortious interference with contract, plaintiffs must show: (1) existence of a contract; (2) defendant knew of the contract; (3) defendant intentionally procured breach of the contract without justification; and (4) plaintiffs suffered injuries as a direct result of defendant's actions. *Bouten v. Richard Miller Homes,* 321 N.W.2d 895, 900 (Minn.1982) (citation omitted); *James M. King & Assoc. Inc. v. G.D. Van Wagenen Co.,* 717 F.Supp. 667, 679 (D.Minn.1989). In this case, the court concludes that at least one of the elements, a breach of contract, is not present.

Plaintiffs base their tortious interference with contractual relations claim on GECC's alleged blocking of the redemption agreement between the Trident and Frey groups. In August 1991, the Frey group agreed to sell its stock to the Trident group for not more than $5 million. That agreement was formalized in a final, written redemption agreement signed by HEII and the Trident group. Plaintiffs and the Frey group contend that GECC asserted its security interest in Waldorf's assets solely to block the agreement even though GECC knew it was not entitled to block a shareholder buyout. By wrongfully asserting its security interest, plaintiffs assert that GECC prevented them from securing alternative financing for the redemption agreement. Thus, the Trident group was unable to secure financing and the redemption agreement lapsed.

GECC contends that because the Trident group was unable to obtain financing for the redemption agreement, it failed to satisfy a condition precedent to the agreement. Therefore, no contract existed and the claims for tortious interference with contract fail. *See Aslakson v. Home Sav. Ass'n,* 416 N.W.2d 786, 789 (Minn.Ct.App.1987) (contract cannot arise without performance of condition precedent). Plaintiffs attempt to distinguish *Aslakson* on the grounds that the defendant in that case had an undisputed contractual right to refuse to consent to an assumption of its mortgage. Here, plaintiffs contend that a claim for tortious interference with contract lies because GECC had absolutely no right to assert a security interest to block the redemption agreement and did so solely to block the agreement.

The court need not decide whether a contract exists or whether *Aslakson* is dispositive on this point. Even assuming that the redemption agreement was a contract for purposes of a tortious interference claim, there is no allegation that GECC procured a breach of the agreement. Nor is there any factual support for the allegation, if made. *See Security Sav. Bank v. Green Tree Acceptance, Inc.,* 739 F.Supp. 1342, 1348 (D.Minn. 1990) (tort requires plaintiff to prove breach of contract). Accordingly, the court concludes that plaintiffs and the Frey group fail to state claims for tortious interference with contract as a matter of law.

■■■ In the alternative, plaintiffs and the Frey group urge the court to construe Count 4 of plaintiffs' complaint and Count 3 of the Frey group's complaint as asserting claims for tortious interference with prospective

business relations. That cause of action, of course, requires neither proof of a contract nor breach of contract. The court agrees that the allegations concerning GECC's blocking of the redemption agreement are properly regarded as stating claims of tortious interference with prospective business relations. In addition, the evidence offered in support of those claims, when taken in favor of the nonmoving parties, is sufficient to withstand summary judgment under Minnesota law. The court construes Count 4 of plaintiffs' complaint and Count 3 of the Frey group's complaint as alleging GECC tortiously interfered with prospective business relations and concludes that, when so construed, the claims survive GECC's motion for summary judgment.

### 3. Implied Covenant of Good Faith and Fair Dealing

In Counts 6 and 7, plaintiffs allege that GECC breached its implied duty of good faith and fair dealing by refusing to release its security interest even though Waldorf repaid the 1987 loan and by unreasonably withholding consent to the redemption agreement unless and until it received a payment of contingent interest. In Count 4, the Frey group also contends that GECC breached its duty of good faith and fair dealing by unreasonably withholding consent to the redemption agreement. GECC contends that plaintiffs and the Frey group fail to state a cause of action and therefore the claims should be dismissed as a matter of law.

■■■■ Both Minnesota and Illinois recognize that every contract contains an implied covenant of good faith and dealing between the parties to it. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992) (applying Illinois law); *Earle R. Hanson & Assoc. v. Farmers Coop. Creamery Co.*, 403 F.2d 65, 69 (8th Cir.1968) (applying Minnesota law). To the extent plaintiffs and the Frey group seek to assert a tort action, the claims fail because neither Minnesota or Illinois recognize a separate tort cause of action for breach of the duty of good faith and fair dealing. Minnesota and Illinois also hold that a cause of action for breach of the duty of good faith and fair dealing cannot

exist independent of an underlying breach of contract claim. *Beraha*, 956 F.2d at 1440; *Int'l Travelers Arrangers v. NWA, Inc.*, 723 F.Supp. 141, 152–53 (D.Minn.1989) (applying Minnesota law), *aff'd in part and rev'd in part on other grounds*, 991 F.2d 1389 (8th Cir.1993).

### A. Choice of Law

■■■■ In Minnesota, the implied covenant of good faith and fair dealing applies to commercial contracts to prevent one party from depriving the other of the benefit of the bargain. There can be no breach of the implied duty of good faith and fair dealing under Minnesota law unless a party's actions make it impossible for the other party to perform the contract. *See, e.g., Maurice Sunderland Architecture, Inc. v. Melvin Simon*, 5 F.3d 334, 339 (8th Cir.1993) (*quoting American Warehousing & Distrib., Inc. v. Michael Ede Mgmt, Inc.*, 414 N.W.2d 554, 557 (Minn.Ct.App.1987)). Under Illinois law, however, the covenant limits the exercise of discretion regardless of whether a party's actions prevent the other from performing the contract. *See, e.g., Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 169–70, 466 N.E.2d 958, 971–72 (1984). The court concludes that this conflict is properly regarded as outcome determinative. Therefore, the court will conduct a limited choice of law analysis without repeating the earlier discussion in its entirety.

The court finds that because the 1987 loan agreement specifies that it is governed by Illinois law, Illinois has more substantial contacts with the claims of breach of the duty of good faith and fair dealing. Also because the claims flow from a contractual relation grounded in Illinois law, the court holds that predictability of results favors application of Illinois law. The court concludes that the forum's governmental interest is not implicated because the Illinois rule does not run contrary to a strong policy of Minnesota. The court declines to evaluate the better law because the court holds that under *Milkovich* the other choice influencing considerations make clear that a Minnesota court would apply Illinois law to the claims of breach of the duty of good faith and fair dealing. *See,*

*e.g., Myers v. Government Employees Ins.,* 302 Minn. 359, 225 N.W.2d 238, 244 (1974).

## B. Breach of the Implied Covenant of Good Duty and Fair Dealing

 While the duty of good faith and fair dealing is not an independent source of duties assumed by the parties, it is implemented, and therefore actionable, through other contractual provisions. Thus, the claims of breach of the duty of good faith and fair dealing are dependent on the breach of contract claims alleged by plaintiffs and the Frey group. In the present action, plaintiffs and the Frey group do not seek recovery based on the theory of a breach of the duty of good faith alone. Rather, the claims are tied into the claims of breach of contract asserted by plaintiffs and the Frey group.

A finder of fact could reasonably conclude that the 1987 loan agreement affords GECC discretion to retain its security interest in the event of prepayment. A finder of fact could also find that GECC had discretion to refuse to consent to the redemption agreement. The duty of good faith requires that GECC exercise its discretion reasonably. *See Beraha,* 956 F.2d at 1444; *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 169–70, 466 N.E.2d 958, 971–72 (1984) ("party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."). It is also clear that a finder of fact could conclude that GECC's exercise of discretion was arbitrary, unreasonable and contrary to the parties' reasonable expectations. Accordingly, the court holds that material questions of fact exist which preclude summary judgment on the issue of whether GECC breached the agreements between the parties by violating its duty of good faith and fair dealing.

## 4. Fiduciary Relationship

In Count 8, plaintiffs allege that GECC breached fiduciary obligations owed to them by refusing to consent to the redemption agreement. Plaintiffs claim that a fiduciary duty arose because GECC, through its agent, Fleming, "interjected itself into the discussions to break the [shareholder] deadlock" and "portrayed itself as a confidante of both groups." Plaintiffs contend that "[b]oth the Frey Group and the Trident Group trusted and relied on GECC to be acting in good faith for the purpose of resolving the deadlock." In its memorandum, plaintiff expands this theory to argue that GECC, by portraying itself as an honest broker of the buyout deal, transformed the debtor-creditor relationship into a fiduciary one. GECC contends that plaintiffs fail to state a cause of action and that no fiduciary duty was owed as a matter of law.

 The court looks to state law to determine if a fiduciary relationship exists. *Davis v. Merrill Lynch, Pierce, Fenner & Smith,* 906 F.2d 1206, 1215 (8th Cir.1990). Under Minnesota law, "[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Stark v. Equitable Life Assurance Co.,* 205 Minn. 138, 285 N.W. 466, 470 (1939) (quotation omitted). A lender-borrower relationship does not give rise to fiduciary duties absent special circumstances. *See, e.g., Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 622–23 (1972). Thus, a fiduciary relationship in the present context, if one exists, must arise out of special circumstances.

 Minnesota has recognized a lender may owe another fiduciary duties where the lender knows or ought to know that the other is placing trust and confidence in the lender and relying on the lender to counsel and inform. *Id.* at 623.[15] Even if plaintiffs placed complete trust in GECC, that fact

---

**15.** Minnesota has also recognized special circumstances when: (1) confidence is placed in the lender which results in superiority and influence over the other party, *Midland Nat'l Bank v. Perranoski,* 299 N.W.2d 404, 413 (Minn.1980); (2) combined with a confidential relationship, the lender has greater access to facts and legal re-

sources, *May v. First Nat'l Bank of Grand Forks,* 427 N.W.2d 285, 289 (Minn.Ct.App.1988); and (3) a disparity of business experience is combined with invited confidence, *Murphy v. Country House, Inc.,* 307 Minn. 344, 240 N.W.2d 507, 512 (1976). The court concludes that these special circumstances are not implicated in this case.

alone does not give rise to a fiduciary duty under Minnesota law. *Id.; Minn. Municipal Power v. St. Peter,* 433 N.W.2d 463, 468 (Minn.Ct.App.1988). To make a prima facie showing of a fiduciary relationship, the evidence must indicate that GECC knew or ought to have known plaintiffs were placing their trust and confidence in GECC and depended on GECC to look out for their interests. *Klein,* 196 N.W.2d at 623.

▇▇▇▇▇▇] The existence of a fiduciary relationship is generally a question of fact. *Minnesota Timber Producers Assoc. v. American Mut. Ins. Co.,* 766 F.2d 1261, 1268 (8th Cir.1985). The court is not precluded, however, from resolving the issue on summary judgment if the undisputed facts establish that no fiduciary duty exists. *Id.* Applying these standards to the dealings between plaintiffs and GECC, the court finds that the evidence as a whole, even when viewed in favor of plaintiffs, does not indicate a fiduciary relationship. Plaintiffs simply characterize GECC as a "broker" and "mediator" and conclude that GECC owed them fiduciary obligations. However, plaintiffs have not shown sufficient evidence of any "special circumstances" necessary to create a fiduciary relationship. Plaintiffs have failed to demonstrate special circumstances beyond a typical lender-borrower relationship sufficient to establish that a fiduciary relationship existed. The court holds that, as a matter of law, a fiduciary relationship did not exist between plaintiffs and GECC in this case. Accordingly, the court grants GECC's motion for summary judgment on Count 8 of plaintiffs' complaint.

**5. Fraud**

▇▇▇▇▇▇ Plaintiffs and the Frey group allege that GECC lured them into executing and guaranteeing the contingent interest agreement by representing that if Waldorf refinanced the 1987 loan GECC would not retain a security interest in all of Waldorf's assets. The elements of fraud are well established. To state a claim of fraud, plaintiffs and the Frey group must allege, with particularity, that:

Defendants made a false representation of a past or present fact, susceptible of

knowledge, knowing it to be false or without knowing whether it was true or false, with the intention of inducing the plaintiffs to act in reliance upon it or under such circumstances that plaintiffs were justified in so acting and was thereby deceived or induced to so act to their damage.

*Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967). Statements of future intent are actionable only where there is evidence that the speaker had no intent to perform at the time the statement was made and made the statement to accomplish the fraud. *Johnson Bldg. Co. v. River Bluff Dev. Co.,* 374 N.W.2d 187, 194 (Minn.Ct.App.1985) (citing *Vandeputte v. Soderholm,* 298 Minn. 505, 216 N.W.2d 144, 147 (1974)).

GECC contends that the pleadings are legally deficient because they do not allege that the statements made by GECC were false, that GECC knew the statements were false, or that GECC had no present intent to perform consistent with the statements at the time they were made. In reviewing the complaints, the court finds that the falsity of GECC's representations and knowledge of falsity are adequately pled. While the allegations concerning GECC's intent at the time the representations were made are murky, the court finds that plaintiffs and the Frey group have pled specific facts which give rise to a strong inference of fraudulent intent. Accordingly, the court concludes that the fraud claims are not subject to dismissal on the pleadings.

GECC also contends that the representations at issue merely stated opinions or predicted the future and therefore are not actionable. GECC concedes that a statement made with a preconceived and undisclosed intent of not acting consistent with the statement constitutes a misrepresentation of material fact. GECC insists, however, that there is no affirmative evidence which indicates that GECC did not intend to perform consistently at the time the representations were made.

The court would agree with GECC if the evidence, taken in favor of the nonmoving parties, showed merely that GECC stated at

one time it would not retain a security interest upon refinancing and then asserted its security interest after Waldorf refinanced. If that were the case, there would be no basis for a finder of fact to conclude that the difference between GECC's statements and its later actions was attributable to fraud. The record does contain, however, some evidence that GECC had a then present intention not to perform consistently with the alleged representations.

GECC maintains that it always intended the security interest to secure Waldorf's obligations and performance under the contingent interest agreement. GECC also maintains that it never intended to release the security interest upon refinancing unless it received a payment of contingent interest. Assuming, as the court must, that GECC made the misrepresentations, there is evidence which indicates that GECC had no present intent to act consistently with its representations. The court concludes that the evidence offered by plaintiffs and the Frey group in support of their fraud claims is sufficient to withstand summary judgment.

 Finally, GECC contends that plaintiffs and the Frey group cannot establish reliance as a matter of law. Justifiable reliance is generally a fact question. *St. Croix Printing Equipment, Inc. v. Rockwell Int'l Corp.*, 428 N.W.2d 877, 882 (Minn.Ct. App.1988). A court may find reliance on oral representations "unjustifiable as a matter of law only if the written contract provision explicitly states a fact completely contradictory to the claimed misrepresentation." *Johnson Bldg. Co.*, 374 N.W.2d at 194. Inconsistencies between oral statements and written contracts which do not rise to clear contradictions are properly left to the trier of fact. *Veit v. Anderson*, 428 N.W.2d 429, 433 (Minn.Ct.App.1988).

The court has already held that "the agreements are ambiguous concerning whether the obligation to pay contingent interest is a liability for purposes of the loan agreement" and that "a material fact exists concerning whether and to what extent plain-

tiffs' prepayment terminates GECC's security interest." *H Enterprises Int'l, Inc. v. General Electric Capital Corp.*, Civ. No. 4–91–679, slip op. at 14 (D.Minn. April 30, 1992). Given the ambiguities contained in the 1987 loan agreement, the court cannot conclude that reliance on the part of plaintiffs and the Frey group was unjustified in this case as a matter of law.

GECC also contends that because plaintiffs and the Frey group are sophisticated parties who were represented by counsel during the loan negotiations, no jury could find they were justified in relying on GECC's representations. While the sophistication of the parties is relevant to reliance, the court finds that it does not dispose of the issue as a matter of law. Accordingly, the court concludes that the record here does not permit the holding as a matter of law that plaintiffs and the Frey group were not justified in relying on GECC's representations.

## A. Duty to Disclose

 To the extent the fraud claims are based on material omissions of fact, GECC contends the claims fail because no duty to disclose was owed. Plaintiffs and the Frey group insist, however, that this case involves special circumstances which make actionable GECC's alleged failure to disclose.

 A claim of fraud may be based on a failure to disclose material facts only where there is a duty to disclose. *See, e.g., Richfield Bank & Trust, Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 650 (1976). The general rule is that "one party to a transaction generally has no duty to disclose material facts to the other" unless special circumstances exist. *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W.2d 619, 622 (1972). Minnesota has long recognized that even if one has no duty to disclose a particular fact, if one chooses to speak he must say enough to prevent the words from misleading the other party. *Newell v. Randall*, 32 Minn. 171, 19 N.W. 972, 973 (1884); *Klein*, 196 N.W.2d at 622.[16] A duty to disclose

---

**16.** In addition, where a fiduciary relationship exists, silence may amount to fraud. *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn.1985). *See*

*also Klein*, 196 N.W.2d at 622 (one who stands in a fiduciary or confidential relation with another owes a duty to disclose). Having concluded that

arises "when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading." *L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989) (en banc).

The exception to the general rule of non-disclosure on which plaintiffs and the Frey group rely concerns statements of fact which are not false but are misleading and therefore fraudulent in the absence of other facts known only to the speaker. Plaintiffs and the Frey group contend that GECC was under a duty to disclose because it made misrepresentations. If the court were to accept that reasoning, every fraudulent utterance would entail a duty on the part of the speaker to disclose that the statement was indeed false and the exception would swallow the rule.

The court concludes that the present case does not fall within the realm of special circumstances where a duty to disclose arises under Minnesota law. The court holds as a matter of law that GECC owed plaintiffs and the Frey group no duty to disclose in this case. Accordingly, insofar as the fraud claims are based on material omissions of fact, the court grants GECC's motion for summary judgment.

## CONCLUSION

Based on a review of the file, record and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. As to plaintiffs' Count 4, the motion of defendant GECC for summary judgment on plaintiffs' claims of tortious interference with prospective business relations is denied.

2. As to plaintiffs' Count 5 and counter-defendants' Count 3, the motions of defendant GECC to dismiss the claims of tortious interference with contract are granted; insofar as the court has held that those Counts assert claims of tortious interference with prospective business relations, however, defendant's motion for summary judgment is denied.

3. As to plaintiffs' Counts 6 and 7 and counterdefendants' Count 4, the motions of defendant GECC to dismiss the claims of breach of the implied covenant of good faith and fair dealing are denied.

4. As to plaintiffs' Count 8, the motion of defendant GECC for summary judgment on plaintiffs' claim for breach of fiduciary duty is granted.

5. As to plaintiffs' Count 10 and counter-defendants' Count 6, the motions of defendant GECC for summary judgment on the fraud claims are granted to the extent the claims are based on material omissions; the motions are otherwise denied.

a fiduciary relationship does not exist here, this special circumstance obviously does not apply.