**UNITED WILD RICE, INC., Respondent,**

v.

**Clifton NELSON, Appellant.**

No. 52010, 81–309.

Supreme Court of Minnesota.

Jan. 5, 1982.

---

Nichols & Willeke, Donald H. Nichols and Daniel J. Starks, Minneapolis, for appellant.

McGovern Opperman & Paquin, Vance K. Opperman and Richard G. Braman, Minneapolis, for respondent.

AMDAHL, Justice.

This is an appeal from two orders of the Ninth Judicial District Court. The first order, dated October 20, 1980, entered a permanent injunction which enjoined the appellant from:

(1) directly or indirectly engaging in the manufacturing, buying or selling of wild rice or wild rice products for a period terminating on July 6, 1981; and

(2) circulating false or unsubstantiated reports about the management, finances, membership, or operations of United Wild Rice, Inc.

The second order, dated February 9, 1981, denied appellant's motion for amended findings of fact and conclusions of law, or, in the alternative, for a new trial.

The issue is whether appellant has engaged in unfair competition, deceptive trade practices, Minn.Stat. § 325D.44 (1980), or unfair trade practices, 7 U.S.C. § 2303 (1976). The district court held in the affirmative. We reverse.

Appellant Nelson has been involved in the Minnesota wild rice business for over 25 years. He is an acknowledged expert in the field and is referred to by many as "Mr. Wild Rice" or the "Wild Rice King." Nelson was one of the founders of United Wild Rice, Inc. (hereinafter United)[1] and served

1. United is a Minnesota cooperative composed of farmer members who grow wild rice. It was originally named Continental Wild Rice Coop-

as its general manager from United's creation in 1971 until December 1972. In addition, he served as a member of United's Board of Directors from 1971 to 1976. In 1975, Nelson expressed to United his desire to get out of the wild rice business. He thereafter negotiated the sale to United of his wild rice processing plant located in Outing, Minnesota. United paid Nelson $210,000 for the plant and a Limited Covenant Not to Compete. The covenant had a 3-year duration.

Appellant's activities during the 3-year period following execution of the covenant were apparently in conformity with the terms of the covenant. During that time, he did not serve on the Board of Directors of United; however, his son Tracy Nelson did. In January 1979, United hired appellant as its interim general manager, the position to be held until such time as United could hire a permanent manager. Although requested to, Nelson did not sign a covenant not to compete when he rejoined United. He held the position of interim general manager, as well as serving as a director, until his resignation became effective in April 1980. United hired a permanent manager in December 1979, at which time Nelson tendered his resignation, to be effective when his replacement became capable of assuming the position.

After leaving United, Nelson formed Northland Wild Rice, Inc. (hereinafter Northland), a wholly-owned corporation. In late May 1980, Northland entered into a Joint Venture Agreement with Ramy Seed Company (hereinafter Ramy) for the purpose of dealing in wild rice. The activities of Northland and Ramy were in direct competition with United.

Northland actively solicited business from wild rice producers, farmers, and buyers.[2] This solicitation was accomplished by personal contacts and mailings. Northland solicited customers who had previously dealt with United and at least three customers who were currently under contract with United. Northland offered wild rice for sale at a price lower than United and succeeded in attracting business. It was so successful, in fact, that United "feared for its very existence." United then filed a complaint in Itasca County District Court, alleging that appellant Nelson had violated the Limited Covenant Not to Compete signed in 1976 and was guilty of both common-law and statutory unfair competition. 7 U.S.C. §§ 2301–2306 (1976); Minn.Stat. §§ 325D.43–.48 (1980). Respondent's motion for a temporary injunction was granted on September 3, 1980, and later was extended to include Northland and the members of Nelson's immediate family. United was at that time required to post a $50,000 bond.

Nelson counterclaimed against respondent alleging anti-trust violations and made a motion to the court that the trial on the matter be bifurcated, the first stage of the trial to concern issues relative to the propriety of a permanent injunction, the second stage to concern the damages issues and appellant's counterclaims. This motion was granted.

The first stage of the trial was presented to the court and culminated in the trial court's order granting a permanent injunction to United which enjoined Nelson from engaging in the manufacturing, buying, or selling of wild rice until July 6, 1981, and from circulating false or misleading reports about United's management, finances, membership, or operations. The trial court based the injunction on its finding that Nelson had engaged in unfair and deceptive trade practices and unfair competition. The court further found that the Limited Covenant Not to Compete had expired by its own terms in 1979. The second stage of the trial has not yet been held.

Nelson then made a motion to the trial court for amended findings of fact and conclusions of law or, in the alternative, for a new trial. Prior to receiving a decision

erative and held that name until 1979 when it was officially changed to United Wild Rice, Inc.

2. Producers are those who harvest lake wild rice; farmers are those who grow wild rice on paddies.

from the trial court, appellant filed a notice of appeal with this court. A prehearing conference was held by a Justice of this court which resulted in the court's order that the matter be remanded to the trial court for a decision on the pending post-trial motion; on remand, the trial court denied Nelson's motions. It is from this order denying Nelson's post-trial motions and from the trial court's findings of fact, conclusions of law, and order for judgment that Nelson appeals.[3]

## UNFAIR COMPETITION

■ There are at least two ways by which an individual can be guilty of unfair competition: tortious interference with contractual interests and improper use of trade secrets. Respondent pled both in his complaint.

(a) Tortious interference with contractual relationships

This state has recognized a cause of action for wrongful interference with both present and prospective contractual relations. *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975); *Witte Transportation Co. v. Murphy Motor Freight Lines, Inc.*, 291 Minn. 461, 193 N.W.2d 148 (1971). In its claim that appellant has interfered with United's present contracts, United points to three United employees: Judy Wahl, Larry Carstens, and Tony Sciullo. United does not argue that Nelson induced the breach of any present contracts held by United with its customers.

■ In an action for tortious interference with contractual relations, the plaintiff carries the burden of proving that interference was caused by the defendant. *Electric Service Co. of Duluth, Inc. v. Lakehead Electric Co.*, 291 Minn. 22, 189 N.W.2d 489 (1971); *Snowden v. Sorenson*, 246 Minn. 526, 75 N.W.2d 795 (1956). United did not meet its burden in the instant case.

■ As concerns employees Wahl and Carstens, United has made no showing of activities of Nelson or his company Northland that could be considered interference. Rather, all the record shows is that Judy Wahl, employed by Northland as a secretary, is a former United employee and the wife of a former United general manager, and that Carstens may have himself approached Nelson in search of employment. No wrongdoing or interference on the part of Nelson has been shown. Neither has interference on the part of Nelson been shown as to United's employment contract with Tony Sciullo.

In July 1980, Northland hired Tony Sciullo as its sales manager. Mr. Sciullo was, prior to joining Northland, sales manager for United. He terminated his employment with United after being demoted; United had not cut his pay, but had limited his duties. Although after quitting his job with United, Sciullo became employed almost immediately with Northland, there has been no showing that Nelson induced Sciullo to break with United. In the absence of such a showing, an action for tortious interference will not lie.

■ The Restatement of Torts sets out the elements of the tort of intentional interference with prospective contractual relations. Restatement (Second) of Torts § 766B (1979). Section 766B states that:

**3.** It appears that appellant did not fully understand the procedure to be followed in this case as set out in this court's prehearing conference order. Appellant filed a notice of appeal from the trial court's order on remand although the prehearing conference order specifically provided that a notice of appeal need not be filed. Apparently, appellant did not understand that the two orders would be reviewed together, and treated each as the subject of a separate appeal. The original brief filed by appellant, therefore, does not discuss the trial court's order denying its post-trial motion. In response, respondent filed a special term motion with this court to strike irrelevant material from appellant's brief, any reference to the post-trial order, arguing that by failing to address the order in its brief, appellant had abandoned the issue of whether the trial court erred in issuing that order. Both parties were contacted by the Clerk of the Supreme Court prior to the time set for oral argument and were advised that the court would review both orders in this appeal. Each party was then given the opportunity to file a supplemental brief with the court. Respondent's motion for an order to strike irrelevant material from appellant's brief is, therefore, denied.

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

*Id.* It is not disputed that appellant did solicit and enter into contracts with United's potential customers. The question is whether this solicitation was improper.

Competition is favored in the law. The law's preference for competition is illustrated by the establishment of a special privilege for competitors. That privilege is set out by the Restatement as follows:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Restatement (Second) of Torts § 768 (1979). Application of the factors listed in section 768 to the facts of this case shows that Nelson's interference was not improper.

Here, the prospective contractual relations Nelson interfered with concerned the buying and selling of wild rice. These activities fall squarely within the ambit of competition between Nelson and United. Nelson did not employ wrongful means in carrying out the interference[4] and the interference does not constitute an unlawful restraint of trade. Finally, Nelson's purpose was, at least in part, to advance his interest in competing with United. On this point, the trial court made the following finding:

In the conduct of the business of Northland, Nelson has utilized his intimate knowledge of United's affairs *not only to gain a competitive advantage* but also to bring to reality his prediction that United was destined to fail and that he could profit therefrom.

(Emphasis added). Nelson's motives were mixed; he desired to improve his own position but also to worsen that of United. In situations such as presented by the instant case, however, there will always be some desire on the part of the ex-employee to best the former employer. Nelson's activities did cause interference with United prospective contractual relations; that interference, however, was not improper.

(b) Improper use of trade secrets

United argued at trial that Nelson had appropriated United's trade secrets, or confidential information, and used them to United's detriment. The information allegedly appropriated by Nelson was United's: financial condition, customer buying habits, contract terms, grades of rice, price information, inventory amounts. There was much evidence introduced at trial that the above listed "information" would give another marketer a competitive advantage over United. This, however, is an insufficient basis on which to premise an injunction.

This court set out the test for determining which information is confidential or a trade secret in *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979). There we stated that:

**4.** *See* discussion of unfair and deceptive trade practices, *infra.*

Certain common elements can be distilled from these definitions and fashioned into a workable test encompassing both concepts [trade secrets and confidential information]. The elements comprising that test are: (1) the protected matter is not generally known or readily ascertainable, (2) it provides a demonstrable competitive advantage, (3) it was gained at expense to the employer, and (4) it is such that the employer intended to keep it confidential.

*Id.* at 90. The legislature has since statutorily defined trade secret.

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn.Stat. § 325C.01(5) (1980). The statutory definition mirrors that set out in *Cherne.* Under this definition, the information is not confidential.

■ United is a cooperative made up of individual farmer members who grow rice. It is run by a Board of Directors, with the general manager at the helm. Each piece of information United classifies as "confidential" is made freely available to every individual member of the cooperative. The information is discussed at Board meetings and members are welcome to attend these meetings. In short, although Nelson, as general manager, had access to this information, so did every member of the cooperative. This is true even though some members may have been in competition with the cooperative at the same time they were members. Were this court to hold that such freely available information is "confidential," United might be then in a position to have each member of the cooperative restrained from competing. Therefore,

United has clearly failed to make reasonable efforts to maintain the secrecy of this information. This "confidential information" would properly be the subject of a convenant not to compete, not a charge of unfair competition. This is especially true in situations such as presented by the instant case where the market is small and one concern holds a large portion of that market.

## DECEPTIVE OR UNFAIR TRADE PRACTICE

The trial court found as a question of fact and held as a matter of law that appellant's statements and actions have violated both Minn.Stat. §§ 325D.43–.48 (1980) (Uniform Trade Practices Act) and 7 U.S.C. §§ 2301–2306 (1976) (Unfair Trade Practices Affecting Producers of Agricultural Products). The court did not, however, specify which provisions of the statutes were violated. The only sections which appear relevant proscribe the making of a false or misleading statement or report that: "disparages the goods, services, or business of another by false or misleading representation of fact," Minn.Stat. § 325.44 subd. 1(8) (1980); or concerns the "finances, management, or activities of associations * * *," 7 U.S.C. § 2303(e) (1976).

■ An action under Minn.Stat. § 325D.44 subd. 1(8) (1980) or 7 U.S.C. § 2303(e) (1976) to recover for a false or misleading statement or report differs significantly from an action for defamation where there is a presumption that the disparaging statement is false. *See* Comment, *The Law of Commercial Disparagement: Business Defamation's Impotent Ally*, 63 Yale L.J. 65 (1953). This provision of the Minnesota Uniform Trade Deceptive Practices Act and presumably the similar provision of the Unfair Trade Practices Act had their genesis in the common-law tort of disparagement. Note, *Disparagement under the Uniform Deceptive Trade Practices Act*, 51 Iowa L.Rev. 1066 (1966). That tort carried no such presumption of falsity; "[l]iability result[ed] only when the plaintiff prove[d] that the defendant's statement [was] false." Comment, *supra* at 75.

The statutory schemes before us make no attempt to alter this burden of proof to require that the defendant prove the truth of the statements. The burden remains, therefore, with the plaintiff to prove that the statement is false. United has not met that burden in this case.

■ United introduced four letters and evidence of Nelson's oral reiterations thereof as proof that Nelson had made false or misleading reports or statements. One of those letters stated in pertinent part as follows:

I tried to reach you on the phone earlier as I wanted to personally advise you in advance of the big changes that are materializing in the wild rice industry.

THE PRICE OUTLOOK ON WILD RICE HAS FALLEN SHARPLY. WE COULD SAVE YOU $250,000.00.

The upshot of all the fighting and feuding in United is that it created an impossible situation for everyone, and I will now be the chief executive officer for the exclusive sales operation of the Ramy Seed Co., Mankato, MN., as NORTHLAND WILD RICE, INC. We will have our offices and plants in Grand Rapids and Deer River.

*We will have the quick cook wild rice*, such as that which you use. Years ago, we developed the process that United uses, and even then we were aware of needed advances to correct some of the

problems, such as the 'hard kernel count', and excess product loss. We wil (sic) be located on city water and sewer for better quality safety as well as city gas for substantial savings.

*This, plus the ability to utilize the new lower prices*, makes it possible for us to project a price now to a customer such as you of $5.29 per pound, available in 60–90 days of order. I have acceptance of other large companies for supplying their needs.

We want to do business with you and it is good business for you to do so. We will look forward to hear (sic) from you.

Yours truly,

NORTHLAND WILD RICE, INC.

Clifton Nelson

Executive Managing Officer [5]

It does not take a careful reading of this letter to see that it is less than complimentary to United. However, United did not prove that the statements contained in this or the other letters were false or misleading. That burden rests squarely upon United. The order of the district court is, therefore, reversed.

---

5. The other letters contained similar statements. The only real difference in the letters was the structure, Nelson having written each letter for a different audience.