HARBOR BROADCASTING, INC., a Minnesota corporation, and Eclectic Enterprises, Inc., a Minnesota corporation, Appellants,

v.

BOUNDARY WATERS BROADCASTERS, INC., a Minnesota corporation, and The Estate of Suzanna Kuralt, Respondents.

No. C1–01–667.

Court of Appeals of Minnesota.

Dec. 4, 2001.

Michael C. Mahoney, Mark W. Peery, Mahoney & Hagberg, P.A., Wayzata, MN, for appellants.

Keith J. Broady, Timothy C. Matson, Abdo and Abdo, P.A., Minneapolis, MN, for respondents.

Considered and decided by ANDERSON, Presiding Judge, PETERSON, Judge, and FORSBERG, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

## OPINION

G. BARRY ANDERSON, Judge.

Appellants brought an action in state court against respondents for tortious interference with business expectancy. Respondents moved to dismiss appellants' claim on the theory that the Federal Communications Act of 1934(FCA) preempted appellants' claim. The district court granted respondents' motion to dismiss and appellants now argue that the district court erred because (1) there is no irreconcilable conflict between the FCA and the common-law remedy of tortious interference with business expectancy; (2) in the alternative, if there is an irreconcilable conflict, the FCA's savings clause preserves the common-law remedy of tortious interference with business expectancy because the claim is predicated on rights and duties distinguishable from those created under the FCA. We conclude that there is an irreconcilable conflict between the FCA and appellants' state common-law tort action and that the FCA's savings clause does not preserve appellants' state-law claim because the common-law action is predicated on rights and duties created under the FCA, and thus we affirm.

## FACTS

Appellant Harbor Broadcasting, Inc. (Harbor), is a Minnesota corporation and the former owner of WWAX, a radio station located in Hermantown, Minnesota. Appellant Eclectic Enterprises, Inc. (Eclectic), is a Minnesota corporation that managed and operated WWAX before its sale on October 1, 1999. Respondent Boundary Waters Broadcasters, Inc. (Boundary Waters), is a Minnesota corporation and the former owner of WELY, a radio station located in Ely, Minnesota. Respondent Estate of Suzanna Kuralt is a New York estate and the former owner of Boundary Waters.

In 1996, the Federal Communications Commission (FCC) granted Harbor a permit to operate WWAX in Hermantown; Harbor retained Eclectic to manage WWAX. On January 10, 1997, the FCC issued a report and order (Upgrade Order) granting Harbor's request to increase the power of its radio transmission and to operate on a different frequency (channel 221C3, instead of 221A). The effect would be an increase in the range of the radio station and, consequently, advertising revenues.

WWAX's increased transmission power posed a risk of signal interference for WELY because of frequency similarity, and the Upgrade Order required WELY to change its frequency and WWAX to reimburse WELY for reasonable expenses associated with that change.

According to appellants' complaint, Harbor "took all steps reasonably necessary to guarantee and assure * * * WELY that it would be reimbursed for all such reasonable costs of changing their frequencies," but Boundary Waters "failed and refused to take any steps whatsoever to comply with the * * * Upgrade Order," so that "WWAX FM was never allowed to increase its power and take advantage of the increased revenues and enhanced value [of the station]." Harbor claims it sold WWAX to KDQS Acquisition Corporation in October 1999 "for a mere pittance of what it would have otherwise been worth," resulting in a loss to Eclectic of "potential profits it would have received during the period it could have operated * * * WWAX under increased power."

On May 22, 2000, appellants served respondents with a summons and complaint,

alleging, inter alia, tortious interference with business expectancy. Respondents moved to dismiss appellants' state-law claims for failure to state a claim upon which relief can be granted under Minn. R. Civ. P. 12.02(e), or in the alternative, for summary judgment under Minn. R. Civ. P. 56.04.

The district court dismissed for failure to state a claim upon which relief can be granted. The court ruled that the FCA's savings clause preserved "state law causes of action for breaches of duty that are distinguishable from those created under the act." But the court concluded that appellants' cause of action was "entirely predicated" on respondents' alleged failure to negotiate in good faith over reimbursement expenses and did not arise out of a separate contractual relationship, but was based solely on the Upgrade Order. Therefore, the court held that appellants' claim for tortious interference with business expectancy did not "establish a distinguishable state law cause of action." This appeal followed.

## ISSUE

Whether the FCA preempts appellants' cause of action for tortious interference with business expectancy?

## ANALYSIS

■ When reviewing cases dismissed for failure to state a claim upon which relief can be granted under Minn. R. Civ. P. 12.02(e), this court determines only

> whether the complaint sets forth a legally sufficient claim for relief. It is immaterial to our consideration here whether or not the plaintiff can prove the facts alleged.

*Doyle v. Kuch,* 611 N.W.2d 28, 31 (Minn. App.2000) (quoting *Royal Realty Co. v. Levin,* 244 Minn. 288, 290, 69 N.W.2d 667,

670 (1955)). The supreme court has explained,

> A claim is sufficient against a motion to dismiss * * * if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded. To state it another way, under this rule a pleading will be dismissed only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded.

*N. States Power Co. v. Franklin,* 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963) (citation omitted).

Appellants argue that their claim for tortious interference with business expectancy is not preempted by the FCA because (1) it does not conflict with the FCA and (2) the FCA's savings clause permits such a claim even if it conflicts with certain FCA provisions.

### A. Implied Preemption: Irreconcilable Conflict

Appellants first argue that the FCA does not preempt a claim for tortious interference with business expectancy because it does not conflict with the FCA. Appellants argue that Congress neither expressly preempted state-law causes of action in the FCA's statutory scheme nor sought to occupy the whole field of law touching and concerning FCA-regulated entities. Therefore, because there is not an irreconcilable conflict between a state-law claim for tortious interference with business expectancy and the FCA, appellants argue that their claim should be permitted to proceed.

■ The United States Supreme Court has cautioned,

> In the absence of an express congressional command, state law is pre-empted

if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' "

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (citations and quotations omitted). Moreover, our supreme court has noted that there is a presumption against preemption:

> Preemption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained."

*Blackburn v. Doubleday Broad. Co.,* 353 N.W.2d 550, 554 (Minn.1984) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)).[1] Therefore, "[i]n determining whether preemption is appropriate, a key question is whether Congress intended to make its jurisdiction exclusive." *Blackburn,* 353 N.W.2d at 554 (citations omitted). We recognize, however, that a preemption claim under the FCA "cannot be judged by reference to broad statements about the 'comprehensive' nature of federal regulation under the [FCA]." *Head v. New Mexico Bd. of Exam'rs in Optometry,* 374 U.S. 424, 429–

30, 83 S.Ct. 1759, 1763, 10 L.Ed.2d 983 (1963) (citations omitted).

■ "The [FCA] constitutes a plenary exercise of the federal government's power to occupy and regulate the broadcast industry." *Blackburn,* 353 N.W.2d at 552 (citation omitted). Under the FCA, Congress has delegated to the FCC "comprehensive powers * * * to administer a 'unified and comprehensive regulatory system for the industry.' " *Id.* (quoting *FCC v. Pottsville Broad. Co.,* 309 U.S. 134, 137, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940)). Indeed, the FCA governs many areas of communications law:

> The FCC is vested with the authority to assign frequencies to stations and determine the power each station shall use, and to issue regulations necessary to carry out the provisions of the chapter. 47 U.S.C. § 303. The FCC is further vested with the authority to "grant to any applicant therefor a station license provided for by this chapter[,]" 47 U.S.C. § 307(a), and to "make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). 47 U.S.C. § 308 sets out the requirements for applying for a station license, or a modification or renewal thereof. 47 U.S.C. § 309 sets out the considerations of the FCC in granting licenses, the procedures followed by the FCC in

---

1. The presumption against preemption is a necessary requirement for a properly functioning and well-balanced federal system. Other courts have also recognized the inherent threat to our federal system when courts improperly cede power to Congress over areas traditionally regulated by the states:

This presumption [against preemption] "is crucial in our federal system, '[f]or if in close or uncertain cases a court proceeds to preempt state laws where that result was

not clearly the product of Congress's considered judgment, the court has eroded the dual system of government that ensures our liberties, representation, diversity, and effective governance.' "

*GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet,* —— S.W.3d ——, ——, 2000 WL 1047011, at *4 (Tex.App. Sept. 13, 2001) (quotations omitted) (second alteration in original).

granting applications for licenses, and the procedures for filing petitions to deny applications. 47 U.S.C. § 312 provides administrative sanctions for violations of the chapter or of any rules or regulations promulgated thereunder.

*Zimmer Radio of Mid–Missouri, Inc. v. Lake Broad., Inc.,* 937 S.W.2d 402, 405–06 (Mo.Ct.App.1997).

The only Minnesota case discussing FCA preemption of state-law causes of action is *Blackburn,* which addressed FCA preemption of private nuisance claims. *See Blackburn,* 353 N.W.2d at 551. In *Blackburn,* private citizens sued five radio stations alleging that defendants' transmissions interfered with the transmissions of radio stations they listened to regularly. *Id.* at 551–52. Apparently, after the defendant radio stations began operating, their radio transmissions caused substantial interference with other radio stations, and the FCC promptly ordered defendants to decrease transmission power. *Id.* Subsequently, the FCC opened an investigation to resolve the interference problems; however, in the interim, the plaintiffs brought private-nuisance actions against the radio stations to obtain immediate injunctive relief and damages. *Id.* at 552. The plaintiffs claimed that defendants' transmissions "distorted" their reception and, therefore, they were entitled to relief. *Id.* at 553.

The supreme court found that the courts, commentators, and the legislative history of the FCA "support[ed] the conclusion that Congress intended to exercise exclusive jurisdiction over regulating interference between radio stations." *Id.* at 555; *see also Fetterman v. Green,* 455 Pa.Super. 639, 689 A.2d 289, 292 (1997). Because Congress intended to retain exclusive jurisdiction over interference disputes, and because a state court could

reach results which conflict with the regulations imposed * * * by the FCC[,] [s]uch a result is clearly irreconcilable with Congress' expressed intent that the FCC should exercise exclusive jurisdiction over regulating this subject matter.

*Blackburn,* 353 N.W.2d at 556; *see also Broyde v. Gotham Tower, Inc.,* 13 F.3d 994, 997 (6th Cir.1994) ("[R]adio signal interference * * * falls within the FCC's technical domain."); *Still v. Michaels,* 166 Ariz. 403, 803 P.2d 124, 125 (Ct.App.1990) (following *Blackburn*); *Zimmer,* 937 S.W.2d at 406 ("We think it clear that allowing a state court to second-guess the FCC * * * would create an obstacle to * * * Congress' purposes and objectives in enacting the FCA."); *Smith v. Calvary Educ. Broad. Network,* 783 S.W.2d 533, 534–37 (Mo.Ct.App.1990) (following *Blackburn*).

The district court in this case did not address whether the FCA and the state-law cause of action for tortious interference with business expectancy actually conflicted; rather, the district court apparently assumed that the two were in conflict and proceeded to the question whether the savings clause preserved the claim notwithstanding the conflict.

■ It is undisputed that the proper inquiry for this court is an implied-preemption analysis. The FCA does not expressly preempt state law; rather we must decide whether the FCA and appellants' state-law claim are in irreconcilable conflict. *See Blackburn,* 353 N.W.2d at 555 ("[T]he preemption question turns on whether there exists an irreconcilable conflict between the purposes of the Federal Communications Act and the common-law remedy at issue."); *Fetterman,* 689 A.2d at 292. Appellants concede that *Blackburn* controls this analysis, but claim that *Blackburn's* facts are dissimilar to this case. Appellants contend that consideration of

their claim for tortious interference with business expectancy would not require the district court to "examine any * * * scientific issues best reserved for experts." Rather, according to appellants, the technicalities of the Upgrade Order ·(and respondents' alleged noncompliance) are only incidental to the ultimate issues in the case.

Respondents argue that appellants construe *Blackburn* too narrowly and point out that the *Blackburn* court cited United States Supreme Court dictum "that the FCC clearly has exclusive control 'over technical matters such as frequency allocation.'" *Blackburn,* 353 N.W.2d at 555 (quoting *Head,* 374 U.S. at 430 n. 6, 83 S.Ct. at 1763 n. 6).

We conclude that the FCA impliedly preempts appellants' state-law claim for tortious interference with business expectancy.

Our conclusion is based on three primary considerations. We recognize that the presumption against implied preemption shifts the burden of showing preemption to respondents. Moreover, in light of the presumption, respondents need to show that *Blackburn* is controlling in the context of a state-law claim for tortious interference with business expectancy. Nevertheless, we believe that *Blackburn* is exclusively controlling under these facts and, under *Blackburn,* appellants' claim is impliedly preempted.

Although there are some substantive differences between the two cases, we conclude that the instant case and *Blackburn* are sufficiently similar to reach the same result. In *Blackburn,* an injunction and damages clearly would have interfered with exclusive FCC prerogatives in regulating radio-frequency allocation, transmission power, and any resulting· interference between radio stations.[2] Here, all of the issues related to the frequency change, including, but not limited to, what expenses were proper and attributable to the change, touch on or involve technical issues that must be decided by "someone" to determine whether certain expenses were appropriate under the Upgrade Order. This "someone" should, and must be the FCC because "the [FCC]'s jurisdiction over technical matters such as frequency allocation * * * is clearly exclusive." *Head,* 374 U.S. at 430 n. 6, 83 S.Ct. at 1763 n. 6.[3]

---

**2.** We recognize that the typical fact patterns involving FCA preemption have involved plaintiffs who brought state-law claims impacting the tariffs or rates that common carriers, such as telephone companies, charge customers. *See, e.g., Cahnmann v. Sprint Corp.,* 133 F.3d 484, 488 (7th Cir.1998) (claims for fraud and breach of contract preempted by the FCA because state-law claims could interfere with the FCC's exclusive responsibility to regulate long-distance telephone tariffs). *But see, e.g., Kellerman v. MCI Telecomms. Corp.,* 112 Ill.2d 428, 98 Ill.Dec. 24, 493 N.E.2d 1045, 1051 (1986) (state-law claims for breach of contract, fraud and deceptive advertising not preempted by the FCA because they do not expressly conflict with the FCA or "interfere with the Federal government's authority over interstate telephone charges or services").

**3.** We are also aware that *Head* evaluated New Mexico's attempt to regulate radio *advertising,* not radio-frequency allocation. The Supreme Court, moreover, found that the FCA did *not* preempt state radio-advertising regulation:

> In the absence of positive evidence of legislative intent to the contrary, we cannot believe Congress has ousted the States from an area of such fundamentally local concern. * * * [T]here has been no showing of any conflict between this state law and the federal regulatory system, or that the state law stands as an obstacle to the full effectiveness of the federal statute.

*Head,* 374 U.S. at 431–32, 83 S.Ct. at 1764. Although *Head* is not directly on point, its logic applies here. *Head* dealt with state regulation of advertising, a concept understood by everyone, or at least better understood than the issue in this case of what expenses, if

For the district court to evaluate appellants' claim for tortious interference with business expectancy, it would necessarily have to scrutinize the Upgrade Order. The Upgrade Order outlined the procedure for changing the broadcast frequencies and mandated that appellants reimburse respondents for the reasonable costs of the changeover. The reasonableness of the changeover costs is fundamentally intertwined with the Upgrade Order itself. Although it is not readily apparent at first glance that the parties' business dispute implicated technical issues, the conclusion is inevitable that technical concerns necessarily follow an inquiry into the business issues.

We conclude that appellants' state-law claim for tortious interference with business expectancy will necessarily implicate and intertwine frequency allocation and other technical concerns best left to FCC administrative proceedings. Therefore, the FCA and appellants' state-law claim for tortious interference with business expectancy are in irreconcilable conflict, and we affirm the district court's dismissal.

### B. Savings Clause

Appellants argue, in the alternative, that if we find that appellants' claim for tortious interference with business expectancy and the FCA are in irreconcilable conflict, the FCA's savings clause preserves their cause of action. Appellants note that they never alleged FCA violations or violations of FCC rules and regulations; rather, they asked the district court for a common-law tort remedy to resolve a business dispute that the FCC has no authority to resolve. The FCA's savings clause states,

any, should be attributed to frequency changeover costs. Therefore, our holding is not inconsistent with *Head;* rather it follows

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414 (1994). The *Blackburn* court addressed the existence and significance of the savings clause in its comprehensive analysis. The supreme court noted that the United States Supreme Court "has refused to read such clauses so literally." *Blackburn,* 353 N.W.2d at 554. The supreme court also quoted with approval a United States Supreme Court case concerning a similar savings clause, in which the Supreme Court commented on the proper scope of such a clause:

That proviso was added at the end of the statute, not to nullify other parts of the Act, or to defeat rights or remedies given by preceding sections, but to preserve all existing rights which were not inconsistent with those created by the statute.

*Id.* at 555 (quoting *Pennsylvania R.R. v. Puritan Coal Mining Co.,* 237 U.S. 121, 129, 35 S.Ct. 484, 487 (1915)); *see also AT & T v. Centr. Office Tel., Inc.,* 524 U.S. 214, 227–28, 118 S.Ct. 1956, 1965, 141 L.Ed.2d 222 (1998); *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 298–300, 96 S.Ct. 1978, 1984–85, 48 L.Ed.2d 643 (1976). Therefore, the *Blackburn* court concluded that the FCA's savings clause has limited significance because even in light of the clause, "the preemption question turns on whether there exists an irreconcilable conflict between the purposes of the [FCA] and the common-law remedy at issue." *Blackburn,* 353 N.W.2d at 555; *see also Smith,* 783 S.W.2d at 536–37 (citing the *Blackburn* language).

the Supreme Court's framework for evaluating implied preemption issues under the FCA.

Other courts have not been so quick to dismiss the impact of the savings clause on the preservation of state-law claims under the FCA, but have limited its scope in essentially the same way as the *Blackburn* court. "Courts in other jurisdictions have held that the savings clause preserves causes of action for breaches of duties distinguishable from those created under the Act." *Coop. Communications, Inc. v. AT & T Corp.*, 867 F.Supp. 1511, 1516 (D.Utah 1994); *see also Kellerman*, 98 Ill. Dec. 24, 493 N.E.2d at 1051. The *Cooperative Communications* court, moreover, noted that the savings clause indicates Congress's intent to preserve independent state-law causes of action, including intentional interference with prospective economic relations:

> In enacting the Communications Act, it is manifest that Congress intended to occupy the field of telecommunications, in order to make available to all people of the United States a rapid, efficient, reasonably-priced communications service, governed by one uniform regulatory scheme. However, inclusion of the savings clause clearly indicates Congress' intent that independent state law causes of action, such as interference with contract or unfair competition, not be subsumed by the Act, but remain as separate causes of action. Hence, while some state law claims may relate to providers of telecommunications service, [they] nevertheless stand as independent claims not arising under the Communications Act.

*Coop. Communications*, 867 F.Supp. at 1516; *see also A.S.I. Worldwide Communications Corp. v. WorldCom, Inc.*, 115 F.Supp.2d 201, 207 (D.N.H.2000) (long-distance telephone reseller's state-law contract and tort claims, including tortious interference with contractual relations, not preempted by the FCA because state regulation not inconsistent with FCA); *Ashley v. S.W. Bell Tel. Co.*, 410 F.Supp. 1389, 1393 (W.D.Tex.1976) (invasion of privacy claim not preempted because FCA remedies "are cumulative to those already existing at common law or by statute" and the FCA "was not designed as a new code for the adjustment of private rights").

The Missouri Court of Appeals, evaluating the effect of the savings clause under a factual situation (pending upgrade order) similar to the one appellants allege, however, has held that the savings clause does not save a state-law claim for tortious interference with business expectancy. *Zimmer*, 937 S.W.2d at 405. In *Zimmer*, plaintiff sued his competitors for tortious interference with business expectancy while his upgrade petition was pending before the FCC. *Id.* at 403–04. The competitors had allegedly taken counter-action against plaintiff by filing applications with the FCC in order to thwart plaintiff's potential success before the FCC. *Id.* at 403. The *Zimmer* court found that a state-law claim for tortious interference with business expectancy "related to a business expectation in a property right [upgrade order] created by the FCA" and, therefore, the FCA "places the exclusive responsibility for [upgrade determinations] with the FCC." *Id.* at 405, 406. The plaintiff's state-law claim for tortious interference with business expectancy was therefore preempted. *Id.* at 406. The savings clause, moreover, did not buttress plaintiff's claim:

> If a plaintiff's action "grows out of and depends upon" the FCA, or is based on property rights or duties created under the FCA, the savings clause does not preserve the action.

*Id.* at 406 (quotation and citations omitted).

In sum, under *Blackburn* and the cases cited above, in order for the

savings clause to preserve a state-law claim, the claim must be based on rights or duties distinguishable from those created under the FCA. Appellants admit that they will have to prove, in order to prevail on a claim for tortious interference with business expectancy:

1.  the existence of a reasonable expectation of economic advantage or benefit belonging to Plaintiff;

2.  that Defendants had knowledge of that expectation of economic advantage;

3.  that Defendants wrongfully and without justification interfered with Plaintiffs' reasonable expectation of economic advantage or benefit;

4.  that in the absence of the wrongful act of Defendants, it is reasonably probable that Plaintiff would have realized his economic advantage or benefit; and

5.  that Plaintiff sustained damages as a result of this activity.

*Lamminen v. City of Cloquet,* 987 F.Supp. 723, 731 (D.Minn.1997) (citing *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 632–33 (Minn.1982)).[4]

The district court based the reasons for its order dismissing appellants' claim for tortious interference with business expectancy on the grounds that, even with the savings clause, the claim is not "distinguishable from those created under the act." The district court concluded, "The Plaintiff's claims here do not arise out of any separate contractual arrangement * * * but arise solely from the order of the [FCC]." Therefore, the "claims are predicated upon said order and do not establish a distinguishable state law cause of action."

Respondents claim that *Zimmer* should guide our analysis. They argue that this set of facts is indistinguishable from *Zimmer* because, without the Upgrade Order, appellants would have nothing to support their claim for tortious interference with business expectancy. Respondents allege that appellants' exclusive remedy for a violation of a FCC order is through FCC or private enforcement in federal district court. We agree.

We conclude that appellants' claim for tortious interference with business expectancy arose from rights or duties that are indistinguishable from those created under the FCA.

It is undisputed that this controversy arose from respondents' alleged failure to comply with the Upgrade Order.[5] Although appellants are not asking the district court to enforce the order, modify the

---

**4.** We decline to decide whether a claim for tortious interference with business expectancy is a valid tort claim under Minnesota law. *United Wild Rice,* which the federal district court of Minnesota and appellants note as approving a claim for tortious interference with business expectancy, only recognized the tort of intentional interference with prospective contractual relations. *United Wild Rice,* 313 N.W.2d at 632–33. One of the elements a plaintiff must prove to establish a claim for intentional interference with prospective contractual relations is that the defendant "prevent[ed] the [plaintiff] from acquiring or continuing [a] prospective [contractual] relation." *Id.* at 633 (quoting Restatement (Second) of Torts § 766B (1979)). Appellants' complaint alleges that they were wrongfully denied the

fruits of a business expectancy of increased advertising revenues; the complaint does not allege that respondents' failure to comply with the Upgrade Order interfered with WWAX's prospective *contractual* relationship with a specific third party. Whether this is a distinction without a difference we leave for another day.

**5.** Because we review this case from the procedural posture of a motion to dismiss for failure to state a claim upon which relief can be granted, we decline to address the merit of appellants' underlying claim. It is worth noting, however, that the Upgrade Order benefited only appellants and created nothing but inconvenience for respondents.

order, or rescind the order, they are asking the district court to determine the parties' legal rights under the Upgrade Order and, consequently, determine what costs would have been reasonable to effect the frequency changeover. The Upgrade Order is essential to appellants' claim, and, therefore, appellants' claim is not preserved by the FCA's savings clause.[6]

## DECISION

Appellants' claim for tortious interference with business expectancy is impliedly preempted by the FCA because it is in irreconcilable conflict with the FCC's exclusive jurisdiction over technical issues surrounding frequency allocation and radio signal transmission. In addition, the FCA's savings clause does not preserve appellants' claim because their cause of action does not arise out of rights and duties distinguishable from those created under the FCA.

**Affirmed.**

---

**6.** Appellants have not cited any case directly on point that supports their position that a claim for tortious interference with business expectancy is not preempted by the FCA, or preserved by the savings clause. Our independent research, however, has found authority supporting the proposition that claims for tortious interference with business expectancy are not preempted, but all are sufficiently distinguishable from the instant case. *See, e.g., KVHP TV Partners, Ltd. v. Channel 12 of Beaumont, Inc.,* 874 F.Supp. 756, 761–62 (E.D.Tex.1995) (claim for tortious interference with business relations between competing TV stations not preempted because claim "do[es] not depend on the Communications Act"); *Uniden Am. Corp. v. Trunking Assocs.,* 841 S.W.2d 522, 525–26 (Tex.Ct.App.1992) (savings clause preserves state-law claims for fraud, breach of contract, and deceptive practices, but FCA preempts state court injunction preventing a radio station from re-locating pursuant to an FCC grant).