# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 12-2487

———————————————

Carl Lee Eller, et al.

*Plaintiffs - Appellants*

v.

National Football League Players Association, et al.

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: June 11, 2013
Filed: September 23, 2013

——————————

Before LOKEN, BEAM, and BYE, Circuit Judges.

——————————

LOKEN, Circuit Judge.

In March 2011, members of the National Football League ("the NFL") -- thirty-two professional football teams -- commenced a lockout of players after bargaining to an impasse with the National Football League Players Association ("the NFLPA") over the terms of a new Collective Bargaining Agreement ("CBA"). In response, active NFL players filed a class action lawsuit in the District of Minnesota alleging violations of the federal antitrust laws and other claims (the "Brady" suit). Retired

NFL players also sued the NFL and its teams, alleging antitrust violations (the "Eller I" suit). The district court consolidated the cases and ordered mediation. In August, active player representatives approved a tentative settlement of the Brady suit, the players re-designated the NFLPA as their collective bargaining agent, the NFL and the NFLPA signed a new CBA incorporating the settlement terms, the Brady plaintiffs dismissed their lawsuit, the lockout ended, and the 2011 NFL season commenced. The settlement as reflected in the new CBA included some $900 million in increased benefits for retired NFL players.

On September 13, 2011, Carl Eller and other retired NFL players filed this class action lawsuit (Eller II) against the NFLPA, its executive director, and certain Brady plaintiffs, asserting that defendants wrongfully barred retirees from the Brady plaintiffs' settlement negotiations, negotiated on retirees behalf without authority to do so, and ultimately agreed to a CBA with fewer benefits for retired players than they could have obtained for themselves. The district court[1] granted defendants' motion to dismiss all claims. Plaintiffs appeal dismissal of their claims for intentional interference with prospective economic advantage. Reviewing the grant of defendants' motion to dismiss *de novo*, and accepting as true the facts alleged in the Eller II complaint, we affirm. See Schmidt v. Des Moines Pub. Sch., 655 F.3d 811, 815 (8th Cir. 2011) (standard of review).

**I.**

For the last forty years, labor relations in the NFL have been affected by the players' use of federal antitrust lawsuits in the District of Minnesota to enhance their position in collective bargaining with the NFL's member teams under the federal labor laws. The Supreme Court has long recognized that "the congressional policy

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

-2-

favoring collective bargaining . . . requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975). But in the NFL context, this court limited the exemption to labor agreements that concern mandatory subjects of collective bargaining and are "the product of bona fide arm's-length bargaining." Mackey v. NFL, 543 F.2d 606, 614 (8th Cir. 1976), cert. dism'd, 434 U.S. 801 (1977). Operating under that rule, every time a CBA between the NFL and the NFLPA expired, the union or its player members filed a new antitrust suit alleging that the NFL's player restrictions were unreasonable restraints of trade. For a concise summary of this complex history, see Brady v. NFL, 644 F.3d 661, 663-68 (8th Cir. 2011), reversing the district court order that preliminarily enjoined the lockout that led to the negotiations and settlement at issue on this appeal.

The rules of this collective bargaining game changed significantly when a nearly unanimous Supreme Court held, overruling Mackey and subsequent lower federal court decisions, that the nonstatutory labor/antitrust exemption applies "to an agreement among several employers bargaining together to implement after [bargaining to an] impasse the terms of their last best good-faith wage offer." Brown v. Pro Football, Inc., 518 U.S. 231, 238 (1996). But despite this clarification, the scope of the nonstatutory exemption remained unsettled, so antitrust lawsuits such as the Brady and Eller I suits continued to be part of the labor relations landscape when a CBA between the NFL's member teams and the NFLPA expired and bargaining over a new CBA reached an impasse.[2]

These historical realities are relevant to the issues raised by this appeal in two significant respects. First, the NFL in 2011 had a strong economic interest in avoiding *future* antitrust liability by resolving its labor relations impasse with the

_____

[2]For an insight into the basis for this continuing uncertainty, see White v. NFL, 822 F. Supp. 1389, 1408-09 (D. Minn. 1993), aff'd, 41 F.3d 402 (8th Cir. 1994).

players through collective bargaining that resulted in an agreement protected by the nonstatutory exemption under the federal labor laws. Thus, as in prior years, the Brady lawsuit was settled and dismissed with a settlement that became the central part of a new CBA entered into after the NFLPA resumed its status as the players' certified collective bargaining representative. Cf. White v. NFL, 836 F. Supp. 1458, 1500-01 (D. Minn. 1993), aff'd, 41 F.3d 402 (8th Cir. 1994); White v. NFL, 822 F. Supp. at 1430-31. Second, the NFL's imperative need to resolve such disputes through collective bargaining put the retired players in a decidedly weaker position. Retirees are not "employees" within the meaning of the National Labor Relations Act. Therefore, they may not be joined with active players as members of the collective bargaining unit, and retiree benefits, while commonly bargained by labor unions representing current employees, are not mandatory subjects of collective bargaining. See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 163-76 (1971); Atwater v. NFLPA, 626 F.3d 1170, 1184-85 (11th Cir. 2010).

## II.

Plaintiffs' detailed Eller II complaint alleged the following: In May 2008, the NFL opted out of the final two years of its 2006 CBA with the NFLPA, scheduled to expire in March 2011. The parties bargained to an impasse on March 11, 2011. That day, the NFLPA renounced its status as the players' collective bargaining agent and amended its bylaws to prohibit collective bargaining with the NFL. Tom Brady and other active players filed the Brady class action lawsuit alleging antitrust violations by the NFL and its member teams. On March 12, the NFL commenced a lockout of the players. On March 28, Carl Eller and other retired players filed the separate Eller I lawsuit against the NFL, also alleging antitrust violations. The district court consolidated the two cases and ordered all parties to mediation before Chief Magistrate Judge Arthur Boylan in sessions that could be "joint or separate."

-4-

On April 4, two NFL owners sent a letter to retired players advising that the NFLPA had "walked away from" the NFL's March 11 proposal. Plaintiffs allege that the terms of that proposal, as described in the letter, included improved benefits for former players which "would have amounted to at least $1.5 billion being allocated to retirees over the ten-year duration of any new CBA." All parties then attended mediation sessions in April and May, with the Eller I plaintiffs being the sole representatives of retired players. In separate sessions with the NFL, counsel for the Eller I plaintiffs made several offers and demands, including one offer that 2.5% of all League revenues be set aside for retired players. The NFL did not accept the proposals, but stated that "key aspects . . . appeared both worthwhile and achievable." After May 16, the NFL also held several sessions with the Brady plaintiffs that neither the Eller I plaintiffs nor their counsel were allowed to attend.

By June, plaintiffs alleged, it had become "public knowledge" that the NFL and the NFLPA were negotiating issues related to the retired players. On July 13, the Eller I plaintiffs moved to amend their complaint to add claims that the NFLPA, its executive director, and the named Brady plaintiffs were improperly negotiating on behalf of retired players. At the urging of counsel for the Eller I plaintiffs, Magistrate Judge Boylan requested that the Eller I plaintiffs be allowed to participate in the Brady plaintiffs' negotiations; the request was refused. On July 19, the NFL's counsel met with counsel for the Eller I plaintiffs and advised that the NFL and the Brady plaintiffs had reached an agreement. The Eller I plaintiffs asked if they could negotiate retiree issues with the NFL. The NFL declined but described benefit improvements for retirees that would be part of an agreement between the NFL and the Brady plaintiffs.

On July 25, the Brady plaintiffs and the NFL agreed to settle the Brady lawsuit contingent on the active players reconstituting the NFLPA as their collective bargaining agent and the NFLPA and the NFL entering into a new CBA by a specified date, with minimum terms set forth in the settlement agreement. Those

terms included benefit improvements for retired players having an estimated value of $900 million over the ten-year duration of the CBA, most notably a "Legacy Fund" providing additional benefits to players whose last credited season was prior to 1993. The NFL on behalf of its member teams and the NFLPA on behalf of its member players signed the 2011 CBA on August 4, 2011. The CBA explicitly stated, "this release does not cover any claims of any retired player."

The Eller I plaintiffs voluntarily dismissed their suit against the NFL without prejudice before the district court ruled on their motion to amend. On September 13, 2011, twenty-eight retired players, including many members of the Pro Football Hall of Fame, filed this class action suit seeking declaratory relief and damages for intentional interference with prospective economic advantage and breach of fiduciary duty. They appeal only the dismissal of their claims under Minnesota law for intentional interference with prospective economic advantage.

**III.**

Minnesota courts have long-recognized the tort of intentional interference with prospective economic advantage. See Wild v. Rarig, 234 N.W.2d 775, 790-93 & n.16 (Minn. 1975), appeal dismissed and cert. denied, 424 U.S. 902 (1976); Witte Transp. Co. v. Murphy Motor Freight Lines, Inc. 193 N.W.2d 148, 151 (Minn. 1971), citing Tuttle v. Buck, 119 N.W. 946 (1909); Gieseke v. IDCA, Inc., 826 N.W.2d 816, 825-26 (Minn. App. 2013). When the alleged interference is with prospective contractual relations, as in this case, the Supreme Court of Minnesota has adopted § 766B of the Restatement (Second) of Torts (1979):

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of

> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the prospective relation.

(quoted in United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982)). In applying this standard, Minnesota courts require that plaintiff prove a *reasonable* expectation of a prospective economic advantage or contractual relation. See Wild, 234 N.W.2d at 790 n.16; Gieseke, 826 N.W.2d at 827-28; Harbor Broadcasting, Inc. v. Boundary Waters Broadcasters, Inc., 636 N.W.2d 560, 569 (Minn. App. 2001).

Plaintiffs contend that defendants improperly interfered with their prospective economic advantage by locking them out of mediation negotiations with the NFL and then negotiating retired player benefits without authorization, resulting in fewer benefits for retired players than they could have obtained if allowed to negotiate with the NFL for themselves. The district court concluded that plaintiffs failed to state a plausible claim for relief because retired players "could not reasonably have expected to enter into a contract based on their own negotiating power as opposed to that of the active players," and because "no reasonable jury could find the purported interference here to be 'improper.'" Eller v. NFL, No. 11-cv-00639, Order at 13, 15 (D. Minn. May 28, 2012). We agree with both grounds of dismissal.

**A. Reasonable Expectation.** Plaintiffs' assertion of a reasonable expectation of prospective economic advantage from bargaining with the NFL on their own behalf is primarily based upon the April 2011 letter from two NFL owners to retired players stating that the NFLPA had walked away from the NFL's last offer that would have provided over $1.5 billion in additional benefits for retired players over ten years. They allege that, if the Brady plaintiffs and the NFLPA had not improperly negotiated a settlement and CBA providing only $900 million in additional benefits

for retired players, retirees would have been able to negotiate an agreement with the NFL providing substantially greater benefits.

As explained in Part I of this opinion, the problems with this theory are (i) the NFL's desire to negotiate player benefits in a CBA protected by the nonstatutory labor antitrust exemption, and (ii) the retired players' lack of standing under the federal labor laws to negotiate a protected CBA on their own. The NFL's April 4 letter described an offer which, as interpreted by plaintiffs, included $1.5 billion in added benefits. But the offer was made to the NFLPA as collective bargaining agent for active players, not to plaintiffs. During mediation of the antitrust lawsuits ordered by the district court, the retired players made separate offers or demands. The NFL allegedly described these proposals as "worthwhile and achievable" but never made a counter-proposal directly to the Eller I plaintiffs.

Plaintiffs allege that counsel for the Eller I plaintiffs "repeatedly" told the NFL during the mediation sessions that "any settlement . . . with former NFL players would occur through an independent organization devoted to the interests of such players that was separate from the NFLPA." But retired players are not members of a collective bargaining unit, and therefore any separate settlement of this kind would not have resulted in a CBA protected by the nonstatutory labor exemption to the antitrust laws. Thus, on July 19, the NFL predictably refused to negotiate further with the Eller I plaintiffs after negotiating a tentative new CBA with the Brady plaintiffs that would include substantially increased benefits for retired players.

Given the undisputed history of labor relations and collective bargaining involving the NFL and its players, the factual allegations in plaintiffs lengthy complaint -- which we accept as true -- provide no plausible reason to believe that the NFL, having agreed with the active players to provide more than $900 million in increased contractual benefits for retired players in a new CBA, would be willing to separately negotiate even greater benefits directly with the retired player class, unless

the Eller I class action claims posed a significant threat of even greater antitrust liability.[3] Thus, even if the NFLPA and the defendant active players bargained on behalf of the retired players without proper authority to do so, as plaintiffs allege, the retired players had no *reasonable* expectation of a separate, prospective contractual relation with the NFL that would provide them greater player benefits than the NFL agreed to provide in the new CBA. A reasonable expectation requires something beyond a mere hope. Cf. Holschen v. Int'l Union of Painters & Allied Trades/Painters Dist. Council #2, 598 F.3d 454, 461 (8th Cir. 2010); Hertz v. Luzenac Grp., 576 F.3d 1103, 1119 (10th Cir. 2009); Int'l Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1405 (8th Cir.), cert. denied, 510 U.S. 932 (1993). Without question, plaintiffs had a reasonable expectation that the collective bargaining impasse and antitrust lawsuits would result in increased benefits for retired players. But no reasonable jury could find they had a reasonable expectation of a prospective separate contractual relation with the NFL that would provide more than the increased benefits provided in the 2011 CBA.

**B. Improper Interference.** Even if plaintiffs alleged a reasonable expectation of prospective contractual relations or economic advantage with the NFL, they failed to allege facts proving that defendants improperly or wrongfully interfered with these advantageous prospects. Plaintiffs allege that defendants impinged on the rights of retired players by improperly negotiating on their behalf and entering into an agreement with the NFL that "sacrificed the rights of retirees for the benefit of active players." As plaintiffs argued to the district court at the hearing on defendants' motion to dismiss:

---

[3]The Brady plaintiffs' separate settlement with the NFL expressly provided that it did not release any claims by retired players in their pending separate antitrust lawsuit against the NFL. Thus, plaintiffs cannot plausibly claim intentional interference with a non-contractual prospective economic advantage from this lawsuit, which the Eller I plaintiffs voluntarily dismissed without prejudice.

Were the retirees harmed? Yes. Because they were negotiating for far more than what the shadow union accepted. Why? Because it reduced the amount that the League had to make available to the retirees and increased the amount that the players would take for themselves.

The first fatal flaw in this theory is plaintiffs' assumption that it is improper for current employees to bargain for increased benefits for retired former employees unless expressly authorized to do so by the retirees. To the contrary, though retired employees are not members of a collective bargaining unit under the federal labor laws, "bargaining over pensioners' rights has become an established industrial practice." Allied Chem. Workers, 404 U.S. at 175; see, e.g., Maytag Corp. v. Int'l Union, UAW, 687 F.3d 1076, 1084-85 (8th Cir. 2012); John Morrell & Co. v. United Food & Commercial Workers, 37 F.3d 1302, 1304-07 (8th Cir. 1994), cert. denied, 515 U.S. 1105 (1995). Thus, the Brady plaintiffs did not interfere with retired players' prospective contractual relations by settling the Brady antitrust suit with a new CBA between the NFL and the NFLPA that included increased retiree benefits. Under the federal labor laws, the retired players *could not* negotiate their own CBA, so the 2011 CBA did not interfere with any prospective labor agreement. And the Brady settlement expressly provided that it did not affect the retirees' pending antitrust claims in Eller I, leaving retired players free to exploit whatever additional bargaining leverage that lawsuit provided.

The second fatal flaw in this theory is that Minnesota law has long recognized a "special privilege for competitors" set forth in § 768 of the Restatement (Second) or Torts. Under this "privilege," a competitor who intentionally causes a third person not to enter into a prospective contractual relation with the defendant's competitor does not *tortiously* interfere (i) if the relation concerns a matter involved in the competition, (ii) the defendant "does not employ wrongful means" or unlawfully restrain trade, and (iii) "his purpose is at least in part to advance his interest in competing with the other." United Wild Rice, 313 N.W.2d at 633, quoting § 768. "Wrongful means" as used in § 768 "refer to means which are intrinsically wrongful

-10-

-- that is, conduct which is itself capable of forming the basis for liability of the actor." Amerinet, Inc. v. Xerox Corp., 972 F.3d 1483, 1507 (8th Cir. 1992) (quotation omitted), cert. denied, 506 U.S. 1080 (1993).

The competitor's privilege is plainly relevant to the complex relationships at issue in this case. On the one hand, active players represented by the Brady plaintiffs had a personal interest in negotiating increased benefits for retired players because all active players will one day retire (a particularly strong interest given the relatively short careers of most professional football players). On the other hand, the active and retired players were competitors for the share of professional football revenues that the NFL was willing to pay to its players.

Plaintiffs alleged that the active players excluded retired player representatives from settlement negotiations that included retiree benefits in order to get a larger share of the total player revenues for themselves. Plaintiffs further alleged they were told during the July 19 meeting with the NFL's counsel that the settlement agreement and 2011 CBA would include a Legacy Fund for players who retired before 1993 -- a fund that by definition would not benefit active players -- that would receive one-half its funding from a salary cap on the active players, an obvious financial detriment to active players. Under the competitor's privilege, these allegations that defendants engaged in collective bargaining under the federal labor laws to further their own economic interests, even at the expense of plaintiffs' economic interests, did not state a claim for tortious interference under Minnesota law. See Restatement (Second) of Torts § 767 cmt. f, § 768 cmt. b; United Wild Rice, 313 N.W.2d at 633; accord Salomon v. Crown Life Ins. Co., 536 F.2d 1233, 1242 (8th Cir.) ("Justification for intentional interference . . . can be provided through proof that the efforts were undertaken to protect a valid economic interest.") (applying the Restatement under Missouri law), cert. denied, 429 U.S. 961 (1976).

Finally, plaintiffs argued for the first time in their reply brief that defendants engaged in "illegal labor negotiations" because the NFLPA controlled and financed the Brady suit and collectively bargained on behalf of active and retired players when, as a decertified union, it had no authority to act as bargaining agent for members of the bargaining unit. This contention is squarely contrary to decisions by the District of Minnesota in prior litigation between the NFL and its players, decisions supported by the General Counsel of the National Labor Relations Board. See White, 822 F. Supp. at 1430-31 (D. Minn. 1993) ("Where it was appropriate for the NFLPA to finance the prosecution of antitrust litigation challenging terms and conditions of employment, the court finds that the NFLPA's role as consultant to class counsel in settling the same litigation is also lawful and appropriate."). In support, plaintiffs cite statements of general labor law principles regarding a union's authority to bargain collectively in NLRB v. Local Union No. 103, Int'l Ass'n of Bridge Workers, 434 U.S. 335, 344 (1978). But as that decision makes clear, those are issues within the exclusive purview of the NLRB. Thus, we reject plaintiffs' suggestion that courts may decide that a "decertified union engaging in collective bargaining under the guise of settlement negotiations . . . constitute[s] improper conduct" under Restatement (Second) of Torts § 766B, cmt. d.

For these reasons, plaintiffs failed to plausibly allege facts establishing that they had a reasonable expectation that either prospective contractual relations or other economic advantage would result if they had been allowed to bargain independently with the NFL, or that defendants improperly interfered with any such expectation. Accordingly, the district court properly dismissed plaintiffs' claims of tortious interference under Minnesota law, and its judgment is affirmed.

BEAM, Circuit Judge, concurring.

I concur in the court's opinion, except for Part III.A., and in the judgment.

_____